1
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2
Elaine A. Ryan (*To be Admitted Pro Hac Vice*)
Patricia N. Syverson (CA SBN 203111)
3
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
4
eryan@bffb.com
psyverson@bffb.com
5
Telephone:  (602) 274-1100

6
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
7
Manfred P. Muecke (CA SBN 222893)
600 W. Broadway, Suite 900
8
San Diego, California 92101
mmuecke@bffb.com
9
Telephone:  (619) 756-7748

10
BOODELL & DOMANSKIS, LLC
Stewart M. Weltman (*To be Admitted Pro Hac Vice*)
11
Max A. Stein (*To be Admitted Pro Hac Vice*)
353 North Clark St., Suite 1800
12
Chicago, Illinois 60654
sweltman@boodlaw.com
13
mstein@boodlaw.com
Telephone:   (312) 938-1670
14

15
(Additional counsel appear on signature page)
Attorneys for Plaintiffs

16

17

18

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 19  PAUL DAVID DACHAUER, On Behalf of Himself and All Others Similarly Situated | Case No.:    16-cv-00216-VC |
| 20 | **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** |
| 21            Plaintiff | |
| 22 | **1.  VIOLATION OF THE UNFAIR COMPETITION LAW, Business and Professions Code §17200 *et seq*; and** |
| 23  NBTY, INC., a Delaware corporation, and  NATURE'S BOUNTY, INC., a | |
| 24  Delaware corporation, | |
| 25            Defendants. | **2.  VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, Civil Code §1750 et seq.** |
| 26 | |
| 27 | **DEMAND FOR JURY TRIAL** |
| 28 | |

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Paul David Dachauer brings this action on behalf of himself and all others similarly situated against Defendants NBTY, Inc. and Nature's Bounty, Inc., and states:

## NATURE OF ACTION

1.      Defendants manufacture, market, sell and distribute what are known as mega-dose[1] Vitamin E supplements under their brand name "Nature's Bounty".[2] Defendants uniformly represent on the front of every label of their products that their Vitamin E supplements will promote immune, heart and circulatory health.  They also make similar representations on the back of their labeling.

2.      Thus, on the front of each and every bottle of their Vitamin E supplements, Defendants represent that the Product "Promotes" (1) Immune Health (2) Heart Health and (3) Circulatory Health. Defendants reinforce these representations on the back of each bottle of Vitamin E, stating that the Product "promotes" immune function and "supports" cardiovascular health.   In truth, Defendants' Vitamin E products do not promote (1) immune health (2) heart health or (3) circulatory health.

3.      These representations have been proven to be false by an overwhelming weight of scientific evidence derived from randomized placebo controlled clinical trials. These are not just a few isolated clinical trial results.  Vitamin E supplements are one of the, if not the, most studied substances in humans.

---

[1] Mega-dose vitamin E supplements are ones that provide supplemental Vitamin E in amounts of 200 IU or greater.

[2] Defendants' Vitamin E Products include: (1) Vitamin E 400 IU Pure d-Alpha; (2) Vitamin E 400 IU with dl-Alpha and Natural d-Alpha; (3) Vitamin E 400 IU; (4) Vitamin E 400 IU Pure dl-Alpha; (5) Water Dispersible Vitamin E 400 IU with dl-Alpha; (6) Vitamin E 200 IU Pure dl-Alpha; (7) Vitamin E 1000 IU Pure dl-Alpha; and (8) Vitamin E 1000 IU with dl-Alpha & Natural d-Alpha  (collectively "the Products" or "Vitamin E").  Plaintiff reserves the right to add additional Products upon completion of discovery.

4.     Based upon this vast weight of evidence from randomized controlled clinical trials, there is a consensus in the scientific community that the mega-dose Vitamin E supplements Defendants sell do not promote immune health/overall health.  For if they did promote immune/overall health there would be less disease or sickness in consumers taking these Vitamin E supplements which would, in turn, lower their rate of all-cause mortality.

5.     But no such lowering of the all-cause mortality rate has been found and the sample size is so large (over 200,000 study subjects) that there is a consensus that any further study of whether these Vitamin E supplements would provide any such benefits would be futile.

6.     In fact, it has been determined that taking mega-dose Vitamin E supplements potentially increases the all-cause mortality rate in those who take them.

7.     As a result, there is a consensus among experts in the field that people should not take mega-dose Vitamin E supplements, such as those sold by Defendants.

8.     Thus, Defendants' Vitamin E supplements are, at best, worthless and, at worst, potentially harmful.

9.     It is clear that in marketing their mega-dose Vitamin E Products, Defendants are playing upon consumers' interest and desire to improve their overall health including immune, heart and circulatory health (collectively "health benefit representations").

10.     A basic tenet of marketing is that consumer purchases are materially influenced by product benefit information displayed on the front of the label, such as the false health benefit representations prominently displayed on the front of Defendants' Vitamin E product labels.

11.     Defendants are also playing upon the fact that the *nutrient* Vitamin E is an essential nutrient.

12.     But, the *nutrient* Vitamin E is not and should not be confused with

1   Defendants' mega-dose Vitamin E *supplements*.

2       13.   While the nutrient Vitamin E is known as an essential nutrient, this does

3   not mean that Defendants' mega-dose Vitamin E supplements provide any health

4   benefits.  They are, in fact, superfluous at best and harmful at worst.

5       14.   The Recommended Daily Allowance ("RDA") of Vitamin E, the

6   nutrient, was set in 2000 by the Institutes of Medicine at 15 mg per day for teenagers

7   over 14 and adults.  This RDA was an estimate based upon the best evidence

8   available, but was by no means deemed to be exact.

9       15.   In fact, over the last 15 years it has been determined that dietary Vitamin

10   E intakes average at around 9.7 mg per day.  Yet, even though there is an apparent

11   "gap" of 5.3 mg between the average intake and the RDA, no negative health

12   consequences have been observed in the United States as a result of this 5.3 mg

13   shortfall between the RDA and the average daily intake.

14       16.   Thus, Americans are getting sufficient amounts of Vitamin E from their

15   diets.

16       17.   Plaintiff is not contending that Defendants are making illegal disease

17   claims under the FDCA, such as expressly representing that Defendants' Vitamin E

18   supplements "prevent heart disease" or that Defendants' Vitamin E supplements

19   "prevent diseases caused by lowered immunity."

20       18.   Rather, Plaintiff contends that Defendants' structure function claims

21   regarding immune health, heart health and circulatory health are false.

22       19.   The measures used by experts in the field to determine whether

23   Defendants' structure function claims are false are results from clinical studies that

24   measure (1) whether Vitamin E supplementation prevents cardiovascular disease or

25   its related conditions, and (2) whether Vitamin E supplementation has a positive

26   effect on all-cause mortality.  While these are, at least in part, disease related

27   endpoints, the fact is that experts in the field believe that if a substance, such as

28

Defendants' mega-dose Vitamin E supplements were to provide, for example, a heart health structure function benefit, the effects of such a benefit would result in a reduction of cardiovascular disease in those taking the supplements.

20.    In this regard, experts in the field recognize that the measure of whether a heart is healthy is that it is free from cardiovascular disease, which is defined as coronary artery disease, hypertensive heart disease, congestive heart failure, peripheral vascular disease and atherosclerosis including cerebral artery disease and strokes, including diseases of the heart muscle, blood vessels that supply the heart, heart failure and electrical conduction problems.  Thus, experts in the field view the test for whether a substance, such as Vitamin E supplements, provide *any* heart benefits, including structure function benefits, is whether the substance has an effect on cardiovascular events or helps prevent cardiovascular disease ("CVD").[3]

21.    Large scale studies have been conducted to test the hypothesis of whether, when taken over a long term, Vitamin E supplements result in less incidence of CVD.  While the endpoints of the studies were the prevention of CVD and its related conditions, if Vitamin E supplements actually provided any clinically meaningful structure function benefits to the heart, such as better circulation, or a stronger heart muscle through healthier cells etc. (e.g., benefits that would justify the purchasing and taking of a Vitamin E supplement), that would have resulted in a reduced incidence of CVD among those studied.  It did not.

22.    If Vitamin E supplements did provide any heart health benefits, these

---

[3] For example, the American Heart Association defines cardiovascular health as the absence of disease.http://www.heart.org/idc/groups/heartpublic/@wcm/@sop/@smd/documents/downloadable/ucm_319831.pdf.  Similarly, the Columbia University Medical web site (http://www.cumc.columbia.edu/cbch/), the Mayo Clinic web site (http://www.mayoclinic.org/cardiovascular-disease-rst/cardioheartclinic.html), and University of Chicago (http://www.ucmc150.uchicago.edu/cardio/) web site all define cardiovascular health in terms of the prevention of CVD.

RCTs were large enough and long enough to have detected any such purported structure function benefits in that there were would have been a lower incidence of CVD or its related conditions in the groups taking vitamin E supplements.

23.    The results of these large scale RCTs, however, demonstrated that Vitamin E supplements, like Defendants' Products, do not provide *any* cardiovascular or heart health benefits – including any structure function benefits.

24.    In this regard, the overwhelming consensus in the scientific community is that Vitamin E supplementation provides no cardiovascular or heart health benefits.   Thus, major  medical groups including the American Heart Association (AHA) and Mayo Clinic do not recommend that they be taken for heart health.

25.    The same is true for Defendants' structure function claim regarding immune health.  While Plaintiff is not alleging that Defendants' "supports immune health" representation states or implies that their mega-dose Vitamin E supplements prevent disease, experts in the field agree that if Defendants' mega-dose Vitamin E supplements did, in fact, affect the structure function of persons' immune health, given the large sample size of persons in these Vitamin E RCTs (over 200,000) those effects would have manifested in a decreased rate of all-cause mortality.  All-cause mortality is, in turn, a measure of which group had less illness, sickness or disease.

26.    But, as more fully discussed below, the combined results of these large-scale long-term RCTs showed that not only did Vitamin E supplements not lower the rate of all-cause mortality (and thus support immune health), persons taking mega-dose Vitamin E supplements like those sold by Defendants actually had an *increased* rate of all-cause mortality.

27.    "All-cause mortality" is deemed to be a valid measure of whether Vitamin E supplements, such as those sold by Defendants, provide any overall long term health benefits, including immune health, heart health and circulatory health. All-cause mortality measures the rate of death in people who take a substance, in this

case Vitamin E supplements, versus placebo.

28.     In the last decade, and in particular the last few years, several high-quality large scale meta-analyses have been conducted, combining the results of numerous RCTs and using them to derive ever more statistically powered observations about the effects of Vitamin E supplements on all-cause mortality. Every one of these meta-analyses has decisively concluded that Vitamin E supplements do not and will not ever lower the rate of all-cause mortality. And, in turn, they have shown that Defendants' mega-dose Vitamin E supplements do not support immune health.

29.     Moreover, several of these well-conducted and highly regarded meta-analyses have concluded that Vitamin E supplementation actually poses a risk of harm because it was found that the all-cause mortality rate for people taking more than 15 mg of Vitamin E supplements was higher than those who took placebo.  In other words, if one takes any of Defendants' mega-dose Vitamin E supplements *they encounter a greater risk of dying than if they took nothing*.  Hardly a product worth buying to "support" one's health.

30.     A stronger measure of whether Vitamin E supplements do not provide immune health benefits is hard to find.  Experts in the field agree that studies finding Vitamin E supplements have no positive effect on all-cause mortality is evidence that they do not provide any immune health benefits.  And the fact that they may induce a higher rate of all-cause mortality means that Defendants' mega-dose Vitamin E supplements pose a risk of harm.

31.     Because immune function necessarily involves preventing disease,  the failure to have any effect on lowering all-cause mortality and, in fact, being deemed to actually increase the rate of all-cause mortality, means Defendants' mega-dose Vitamin E supplements provide no structure function benefit to immune health.

32.     The author of the largest and most comprehensive meta-analyses to date

found that taking Vitamin E supplements in amounts greater than 15mg increases the rate of all-cause mortality. See, e.g., Bjelakovic G, Nikolova D, Gluud C., *Meta-Regression Analyses, Meta-Analyses, and Trial Sequential Analyses of the Effects of Supplementation, with Beta-Carotene, Vitamin A, and Vitamin E Singly or in Different Combinations on All-Cause Mortality: Do We Have Evidence for Lack of Harm?* PLOS ONE September 2013: Vol. 8, Issue 9, e74558.  In fact, this meta-analysis did what is called a "futility analysis."  A futility analysis is a statistical analysis of whether or not any future study of Vitamin E supplements and all-cause mortality should be conducted.  The authors concluded that, based upon the sample size already existent, well-established statistical principles require the conclusion that any future studies will never result in a finding that Vitamin E supplements decrease all-cause mortality.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

33.     This conclusion is perhaps best illustrated by the futility graph presented with this meta-analysis, see Figure 7 of Bjelakovic:



Figure 7. Trial sequential analysis of 44 trials assessing vitamin E in a dose above the RDA (> 15 mg) daily versus placebo.

34.     In figure 7 above, the green line above the X axis represents the point at which Vitamin E supplements would be shown to have a positive/lowering effect on the rate of all-cause mortality.  The green line below the X axis represents the point at which Vitamin E supplements would be shown to have a negative/increasing effect on the rate of all-cause mortality.

35.     The blue line represents the combined results of the RCTs conducted on Vitamin E supplements and all-cause mortality. As can be seen, in the very beginning, the initial results of the few early RCTs projected a positive effect on all-

cause mortality, but as time went on and more RCTs were performed it can be seen that the blue line continues to dip until it dips below the green line underneath the X axis – or that the combined results of the RCTs showed that Vitamin E supplementation increases the rate of all-cause mortality.

36.    This blue line dips lower, rises slightly and then plateaus just below the green line underneath the X axis, meaning that it is and will continue below this harm line.

37.    As important, if not more, are the red lines on the figure that appear above both green lines.  These are the "futility" lines – once the blue line crosses one of these lines it is, per well-established statistical analyses, deemed that any future testing will be futile in terms of combined future studies finding a different result. Or, in the case of this figure, once the blue line crossed the red line that is beneath the X axis, and because of the large sample size,  it is statistically futile to try to prove that Vitamin E supplements will ever have a positive effect on all-cause mortality and in turn a positive effect on immune health.

38.    Based upon these results, Bjelakovic et al. concluded, "When combined with dietary intake, the total intake of vitamin A and vitamin E antioxidant supplement users in the United States exceeds 100% of the estimated average requirement, with the intake of vitamin E exceeding 700% of the estimated average requirement …. The current evidence on the effects of these antioxidants on all-cause mortality, disease occurrence, and quality of life does not support the use of these antioxidant supplements in a generally nourished population."

39.    Even less inclusive meta-analyses such as Curtis AJ, Bullen M., Piccenna L., McNeil JJ., *Vitamin E supplementation and mortality in healthy people: A meta-analysis of randomized controlled trials.* Cardiovasc Drugs Ther 2014; 28:563-73, which limited themselves to RCTs that only involved healthy people, while finding that the blue line was slightly above the harm line (the green line below

the X axis) also found that future study was futile and that Vitamin E supplements would never be found to lower the rate of all-cause mortality/affect immune health. Thus, Curtis et al. concluded, "Our result adds to the evidence that supplemental vitamin E has no discernible clinical impact amongst individuals who are not nutrient deficient[4] … There is no evidence of an effect (either positive or negative) of vitamin E supplementation on all-cause mortality in apparently healthy people as determined by pooled analysis of 18 randomized trials including a total of 71,116 and 71,103 people randomized to vitamin E and control groups, respectively.  The results provide no support for recommending vitamin e supplementation to healthy adults."

40.     Similarly, the U.S. Preventative Services Task Force, a group of experts in the field[5] who reviewed the scientific evidence regarding Vitamin E supplements, concluded "with moderate certainty that *the net benefit of vitamin E supplementation is zero*," including zero oxidative stress, zero inflammation, zero CVD, zero cancer and zero all-cause mortality benefits.  *Id*. at 562 (emphasis added).

41.     Defendants also represent that their mega-dose Vitamin E supplements

---

[4] Nutrient deficient persons are persons with certain rare diseases such as Friedreich's Ataxia or cystic fibrosis.  These two conditions are listed as "rare diseases" by the Office of Rare Diseases of the National Institutes of Health http://www.rightdiagnosis.com/c/cf/prevalence.htm#prevalence_intro and http://www.rightdiagnosis.com/f/friedreichs_ataxia/prevalence.htm#about_prevalen ce_and_incidence.  This means that less than 200,000 people are affected by each in the United States or 0.00%, respectively. In fact, Friedreich's Ataxia incidence in the general population is 1 in 50,000 (https://en.wikipedia.org/wiki/Friedreich's_Ataxia) which is approximately 6,430 persons or 0.00002 of the United States population of 321,000,000                 (http://worldpopulationreview.com/countries/united-states-population/).

[5] Created by Congress in 1984, "the U.S. Preventive Services Task Force (USPSTF or Task Force) is an independent group of national experts in prevention and evidence-based medicine that works to improve the health of all Americans by making evidence-based recommendations about clinical preventive services such as screenings, counseling services, or preventive medications." http://www.ahrq.gov/professionals/clinicians-providers/guidelines-recommendations/uspstf/index.html

support healthy skin.  Plaintiff does not assert that this representation is false because there are no competent and reliable RCTs that have ever addressed this question. Nevertheless, it is Plaintiff's contention that the vast majority, if not all, of the purchasers of Defendants' mega-dose Vitamin E supplements buy them based upon the health benefit representations and few, if any, solely buy them to promote healthy skin.  To the extent that there is any measurable percentage of consumers who buy Defendants' products solely for skin health, this percentage can be determined based upon consumer survey evidence and any such percentage can be deducted from the aggregate damage amount calculated based upon the sales of Defendants' Products.

42.    As a result of Defendants' deceptive health benefit representations, consumers – including Plaintiff and members of the proposed Class – have purchased Products that do not perform as advertised.

43.    Consumers' damages are easily calculated – damages are the purchase price they paid because the mega-dose supplements they purchased are worthless and potentially harmful.  Information regarding the retail prices paid by consumers for Defendants' products, if not available from Defendant, can be readily obtained from third party organizations that obtain and compute this information, such as Nielsen or IRI.

44.    Plaintiff brings this action on behalf of himself and other similarly situated consumers who purchased the Vitamin E Products, to halt the dissemination of this false, misleading and deceptive advertising message, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Products.  Based on violations of California state unfair competition laws and other similar state consumer fraud laws, Plaintiff seeks injunctive and monetary relief for consumers who purchased the Vitamin E Products.

/ / /

/ / /

**JURISDICTION AND VENUE**

45.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and some members of the Class are citizens of a state different from Defendants.

46.     This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do conduct business in California. Defendants have marketed, promoted, distributed, and sold the Products in California and Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible.

47.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events giving rise to Plaintiff's claims occurred while he resided in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial business in this District

**PARTIES**

48.     Plaintiff David Paul Dachauer resides in San Anselmo, California and is a resident of California.  In or around June 17, 2015, Plaintiff Dachauer was exposed to and relied upon Defendants' health benefit representations after reading the label of the Vitamin E 1000 IU product.  Plaintiff Dachauer purchased Vitamin E 1000 IU at a Rite-Aid in San Rafael, California in reliance on Defendants' health benefit representations.  The Vitamin E 1000 IU Plaintiff Dachauer purchased did not and could not provide the represented health benefits because, as discussed herein, the vast weight of scientific evidence and the consensus in the scientific community is that Vitamin E supplements have been conclusively proven to not provide any of these health benefits.  As a result, Plaintiff Dachauer suffered injury

1  in fact and lost money. Had Plaintiff Dachauer known the truth about Defendants'
2  misrepresentations, he would not have purchased Vitamin E 1000 IU.

3      49.    Defendant NBTY, Inc. ("NBTY") is a corporation organized and
4  existing under the laws of the state of Delaware.  NBTY's headquarters is at 2100
5  Smithtown Ave., Ronkonkoma, New York 11779.  NBTY manufactures, advertises,
6  markets, distributes, and/or sells the Vitamin E Products to tens of thousands of
7  consumers in California and throughout the United States.

8      50.    Defendant Nature's Bounty, Inc. ("Nature's Bounty") is a corporation
9  organized and existing under the laws of the state of Delaware. Nature's Bounty is a
10 subsidiary of NBTY. Nature's Bounty is headquartered at 110 Orville Drive,
11 Bohemia, New York 11716. Nature's Bounty manufactures, advertises, markets,
12 distributes, and/or sells the Vitamin E Products to tens of thousands of consumers in
13 California and throughout the United States.

14     51.    Plaintiff is informed and believes, and thus alleges, that at all times
15 herein mentioned, each of the Defendants was the agent, employee, representative,
16 partner, joint venturer, and/or alter ego of the other Defendant and, in doing the things
17 alleged herein, was acting within the course and scope of such agency, employment,
18 representation, on behalf of such partnership or joint venture, and/or as such alter
19 ego, with the authority, permission, consent, and/or ratification of the other
20 Defendant.

21                         **FACTUAL ALLEGATIONS**

22     52.    Defendants manufacture, distribute, market and sell nationwide Vitamin
23 E dietary supplements under their brand name "Nature's Bounty."  They are: (1)
24 Vitamin E 400 IU Pure d-Alpha; (2) Vitamin E 400 IU with dl-Alpha and Natural d-
25 Alpha; (3) Vitamin E 400 IU; (4) Vitamin E 400 IU Pure dl-Alpha; (5) Water
26 Dispersible Vitamin E 400 IU with dl-Alpha; (6) Vitamin E 200 IU Pure dl-Alpha;
27 (7) Vitamin E 1000 IU Pure dl-Alpha; and (8) Vitamin E 1000 IU with dl-Alpha &
28

Natural d-Alpha.[6]

53.    Defendants' Vitamin E Products are sold in virtually every major food, drug, and mass retail outlet in the country.  The Vitamin E Products are available in 50, 60, 100, and 120 count bottles retailing for between $10.00 and $17.00.

54.    Throughout the relevant time period, Defendants have consistently conveyed the message to consumers throughout the United States that their Vitamin E supplements provide health benefits simply by taking the recommended daily dosage.   They do not.   Defendants' health benefits representations are false, misleading and deceptive.

55.    Defendants represent that the claimed health benefits are achieved from the Products' only purported active ingredient - Vitamin E.  Vitamin E is a fat-soluble nutrient found in a variety of foods including, nuts, seeds, and green leafy vegetables. In the 1980s and 1990s, because Vitamin E was found to slow down the oxidation of LDL cholesterol in a test tube setting (i.e. *in vitro* testing) it, along with certain other vitamins such as C and D, was coined an antioxidant.  That Vitamin E carries an "antioxidant" label does not, however, mean that it provides any health benefits.  In fact, there is little known about how Vitamin E and other purported antioxidants actually work in the human body.  For example, the IOM stated in 2000, "A metabolic function has not yet been identified.  Vitamin E's major function *appears* to be as a non-specific                    chain-breaking                    antioxidant." http://iom.nationalacademies.org/~/media/Files/Activity%20Files/Nutrition/DRIs/D RI_Vitamins.pdf.   This lack of knowledge about how Vitamin E, the nutrient, actually works remains today.

56.    "Basic science" studies (e.g. *in vitro*, *in vivo*, and animal studies) conducted decades ago led to hypotheses, yet to be proven in humans, that Vitamin

---

[6] Plaintiff reserves the right to supplement this Product list upon completion of discovery.

E's purported antioxidant properties might provide a whole host of health benefits. It is recognized by experts in the field, however, that such "basic science" studies only create hypotheses that need to be tested and do not constitute scientific proof that a substance works in humans.

57.   The popularity of Vitamin E and sales of the supplement got an additional boost when, in the early 1990s, "observational studies" reported a perceived relationship between the intake of Vitamin E and the prevention of cardiovascular disease.   As a result of those studies – and the commonly held perception at the time that Vitamin E supplements were safe – there was a rapid increase in use of Vitamin E supplements.

58.   However, like basic science studies, observational studies (also known as "epidemiological or population studies") are not considered by experts in the field to constitute adequate proof of cause and effect in human beings.   Among other things, observational studies cannot control for confounding factors such as whether the subjects taking Vitamin E were leading healthier lifestyles.   As a result, as with basic science studies, observational studies are deemed by experts in the field to provide hypotheses about potential effects which then must be tested through RCTs.

59.   The accepted form of scientific evidence recognized by experts in the field for determining any heart or other human health benefit provided by a substance such as Vitamin E is through RCTs.

60.   Since the mid–1990s, Vitamin E has been the subject of numerous, large scale/long-term–RCTs, making it one of the most tested substances ever.   To date, there have been more than 25 large long–term RCTs or meta–analyses published, involving collectively over 200,000 subjects.

61.   That Vitamin E supplements may provide any of the health benefits represented by Defendants has been discredited fully by this scientific research.   The large randomized clinical trials consistently show that Vitamin E supplementation

provides no heart health benefits, as Vitamin E supplements were no better than placebo in affecting the markers for heart health, such as reducing the risk for cardiovascular disease and its associated outcomes including heart attacks, stroke, or mortality.  In other words, the numerous large scale RCTs that make Vitamin E supplements one of the most studied substances ever have established that Vitamin E supplements **do not "Promote[] Heart Health."**

62.   Representative examples of studies concluding that Vitamin E supplementation does not provide heart health benefits include: Sesso, H.D., et al., *Vitamins E and C in the Prevention of Cardiovascular Disease in Men, The Physicians' Health Study II Randomized Controlled Trial*, 300(18) JAMA 2123–33 (Nov. 2008) (concluding that long term Vitamin E supplementation does not prevent cardiovascular events in healthy middle–aged and older men and concluding with the recommendation that persons not take Vitamin E supplements); Lee, I–Min, et al., *Vitamin E in the Primary Prevention of Cardiovascular Disease and Cancer. The Women's Health Study: A Randomized Controlled Trial*, 294(1) JAMA 56–65 (July 2005) (concluding that Vitamin E supplementation provided no heart health benefits in healthy women and recommending that women not take Vitamin E supplements); Lonn, E., et al., *Effects of Long–Term Vitamin E Supplementation On Cardiovascular Events And Cancer: A Randomized Controlled Trial*, 293(11) JAMA 1338–47 (Mar. 2005) (concluding that long-term Vitamin E supplementation does not prevent cardiovascular events, and in fact, may increase the risk for heart failure and recommending not taking Vitamin E supplements); Arnold, J., et al., *Prevention of Heart Failure in Patients in the Heart Outcomes Prevention Evaluation (HOPE) Study*, 107 Circulation J. 1284–290 (Feb. 2003) (concluding that  participants taking 400 IU/day of Vitamin E experienced no fewer cardiovascular events or hospitalizations for heart failure or chest pain than participants taking a placebo); Chae C., Albert C., Moorthy, MV, Lee I., Buring, J., *Vitamin E Supplementation and*

*the Risk of Heart Failure in Women*, Circulation: Heart Failure, 5:176 Journal of the American Heart Association 182 (2012) (concluding that "at the present time, the cumulative evidence to date does not support the use of Vitamin E supplementation to reduce the risk of cardiovascular diseases").[7]   These large scale and long term RCTs conclusively demonstrate that Vitamin E supplementation provides no heart health benefits.  That the results of these large scale/long term studies showed that Vitamin E supplements were no better than placebo demonstrate Defendants' heart health representations are false, misleading or deceptive.

63.   Numerous meta-analyses – which employ accepted statistical analyses to combine the results of multiple RCTs – have likewise concluded that Vitamin E supplements do not provide any all-cause mortality benefits.  Additionally, those meta-analyses indicate that people who take a dosage of more than 15mgs of Vitamin E supplements are actually *more likely to die* than those taking a placebo.  *See* Miller ER 3rd, Pastor–Barriuso R, Dalal D et al., *Metaanalysis: High–Dosage Vitamin E Supplementation May increase all–cause mortality*, Ann Intern Med 2005; 142(1):37–46; Bjelakovic G, Nikolova D, Gluud LL, Simonetti RG, Gluud C., *Mortality in randomized trials of antioxidant for primary and secondary prevention: systematic review and meta–analysis*, JAMA Feb 28 2007; 297(8):842–857; Bjelakovic G, Nikolova D, Gluud C., *Meta-Regression Analyses, Meta-Analyses, and Trial Sequential Analyses of the Effects of Supplementation, with Beta-Carotene, Vitamin A, and Vitamin E Singly or in Different Combinations on All-Cause Mortality: Do We Have Evidence for Lack of Harm?* PLOS ONE September 2013: Vol. 8, Issue 9, e74558.  Curtis AJ, Bullen M., Piccenna L., McNeil JJ. *Vitamin E*

---

[7] Consistent with the forgoing allegations regarding the hypotheses presented by basic science and observational studies, each of these studies, in prefatory statements, noted the results of the basic science or observational studies as background for why they were conducting their particular RCT.  Ultimately, the RCTs did not support the results of the basic science or observational studies.

*supplementation and mortality in healthy people: A meta-analysis of randomized controlled trials.* Cardiovasc Drugs Ther 2014*; 28:563-73*

64.    Furthermore, in analyzing the endpoint "all-cause mortality," which is what the above-referenced meta-analyses did, they were evaluating whether Vitamin E supplementation provided *any* overall health benefits, including immune health. Even if one were to ignore or contest the findings regarding whether Vitamin E supplementation above 15 mg increases all-cause mortality, the Bjalakovic 2013 study, the most all-inclusive study of Vitamin E supplementation to date, concludes that any further studies attempting to show that Vitamin E supplementation might provide any general health benefits such that it might decrease all-cause mortality would, because of the already large sample size, be statistically futile.

65.    Thus, Vitamin E supplementation has been definitively proven to provide no overall general health benefits (e.g., such as the hypothesis that since Vitamin E the nutrient is an antioxidant, Vitamin E supplements might provide some generalized health benefits) and has been proven to pose a risk of harm.

66.    Since the last of the large scale long term studies showed that Vitamin E supplementation caused a statistically significant increase (17%) in the incidence of prostate cancer in men over 50 (the "Select" study), there have been no other large scale long term RCTs conducted regarding whether Vitamin E supplements like those sold by Defendants may provide any health benefits.  In short, the book is closed on the question of Vitamin E supplementation.   The scientific evidence and the overwhelming consensus in the scientific community is that Americans should not and do not need to take Vitamin E supplements – that, at best, are superfluous and, at worst, are harmful.

67.    In light of this consensus, well-regarded science organizations have uniformly stated that Vitamin E supplementation does not provide any cardiovascular or heart health benefits.   The American Heart Association has released science

advisories, including one in 2004, concluding that "scientific data do not justify the use of antioxidant vitamin supplements for CVD [cardiovascular disease] risk reduction."[8]

68.     Mayo Clinic researchers reached the same conclusion upon evaluating the history of studies of Vitamin E supplements: "The bottom line is that even though initial laboratory studies, animal studies and population research into the health benefits of Vitamin E looked promising, the clinical trial findings which provide the best form of evidence didn't bear that out. Instead, they uncovered health risks that make it unwise to take separate Vitamin E supplements."[9]

69.     Despite the overwhelming evidence that the Products do not promote the represented  health benefits, each and every one of Defendants' Product packages and labels repeatedly emphasizes that the Products "Promote[] Immune Health, Heart Health [and] Circulatory Health[10]."  Each and every consumer who purchases these Products is exposed to these false and deceptive health benefit representations, which appear prominently and conspicuously on the front and back of each bottle as follows:

---

[8] In reaching its conclusion based upon review of the RCTs, the Heart Association also recognized that the "positive findings from observational studies with regard to vitamin E supplementation and lower rates of CVD may be a reflection of the generally healthy lifestyles and dietary intakes of supplement users" rather than any true causal effect.  American Heart Association Science Advisory on Antioxidant Vitamin Supplements and Cardiovascular Disease *available at* http://circ.ahajournals.org/content/110/5/637.full.

[9] Mayo Clinic Medical Edge Newspaper Column, *Possible Risks Associated with Taking Vitamin E Supplements*, March 18, 2011 *available at* http://www.mayoclinic.org/medical–edge–newspaper–2011/mar–18a.html.

[10] This purported health benefit is related to heart health and its falsity is subsumed in the results from the various heart health RCTs.



Copies of the labels are attached hereto as Exhibit A.

***The Impact of Defendants' Wrongful Conduct***

70.     Despite the scientific evidence that Vitamin E supplementation does not "promote" the represented health benefits, Defendants continue to unequivocally convey through their advertising and labeling the uniform message:  their Vitamin E products "promote[].immune health.heart health [and].circulatory health."

71.     Plaintiff and Class members have been and will continue to be deceived or misled by Defendants' deceptive health benefit representations.  Plaintiff purchased the Vitamin E Products during the Class period and in doing so, read and considered the Products' labels and based his decision to buy the Products on all the health benefit representations made by Defendants. Defendants' health benefit representations were a material factor in influencing Plaintiff's decision to purchase and consume the Products.  Plaintiff would not have purchased the Products had he known that Defendants' health benefit representations were false and misleading and that competent and reliable scientific evidence demonstrates that Vitamin E does not promote heart health or provide any other health benefit and may actually pose a risk of harm.

72.     As a result, Plaintiff and the Class members have been injured in their

purchases of these Products and have been deceived into purchasing Products that they believed, based on Defendants' representations, promote one or more the represented  health benefits, when, in fact, they do not.

73.    Defendants, by contrast, reaped enormous profits from their false marketing and sale of these Products.

## CLASS DEFINITION AND ALLEGATIONS

74.    Plaintiff Dachauer brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants:

> **Multi-State Class Action**
> All consumers who, within the applicable statutes of limitations, purchased Defendants' Vitamin E Products in California and states with similar laws.[11]
>
> Excluded from the Class are Defendants and their officers, directors and employees and those who purchased Nature's Bounty Vitamin E dietary supplements for the purpose of resale.

75.    In the alternative, Plaintiff Dachauer brings this action on behalf of himself and all other similarly situated consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants for violations of California consumer protection laws:

---

[11] While discovery may alter the following, Plaintiff preliminarily avers that Defendants violated the laws prohibiting unfair and deceptive trade practices of the states and territories wherein Class members reside, including: Cal. Bus. & Prof. Code §17200 et seq.; California Civil Code §1750 et seq.; Fla. Stat. §501.201 et seq.; Fla. Stat. §§817.06; 815 Ill. Comp. Stat. 502/1, et seq.; Mass. Gen. Laws ch.93A et seq.; Mich. Stat. §445.901 et seq.; Minn. Stat. §8.31 et seq.; Missouri Stat. §407.010 et seq.; N.J. Rev. Stat. §56:8-1 et seq.; N.Y. Gen. Bus. Law §349 et seq.; and Wash. Rev. Code. §19.86.010 et seq.

## California-Only Class Action

All consumers who, within the applicable statute of limitations period, purchased Defendants' Vitamin E products in California.

Excluded from this Class are Defendants and their officers, directors and employees and those who purchased Nature's Bounty Vitamin E dietary supplements for the purpose of resale.

76.   **Numerosity**.  The members of the Class are so numerous that joinder of all members of the Class is impracticable.  Plaintiff is informed and believes that the proposed Class(es) contain thousands of purchasers of the Vitamin E Products who have been injured by Defendants' conduct as alleged herein.  The precise number of Class members is unknown to Plaintiff, but ascertainable.

77.   **Existence and Predominance of Common Questions of Law and Fact**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

- whether Defendants' representations are false, misleading, or likely to deceive;
- whether Defendants engaged in false or misleading advertising;
- whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;
- whether Plaintiff and Class members are entitled to other appropriate remedies, including corrective advertising and injunctive relief;
- whether Defendants' alleged conduct violates public policy; and
- whether the alleged conduct constitutes violations of the laws asserted.

78.   **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above and were subject to Defendants' deceptive health benefit

1   representations that accompanied each and every bottle of Vitamin E.  Plaintiff is
2   also advancing the same claims and legal theories on behalf of himself and all
3   members of the Class and the evidence he will use to prove his claims will be the
4   same as the evidence that would prove the claims of all class members.

5       79.   **Adequacy of Representation**.  Plaintiff will fairly and adequately
6   protect the interests of the members of the Class.  Plaintiff has retained counsel
7   experienced in complex consumer class action litigation, and Plaintiff intends to
8   prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to
9   those of the Class.

10      80.   **Superiority**.  A class action is superior to all other available means for
11  the fair and efficient adjudication of this controversy.  The financial injury suffered
12  by individual Class members is relatively small compared to the burden and expense
13  that would be entailed by individual litigation of their claims against Defendants.  It
14  would thus be virtually impossible for members of the Class, on an individual basis,
15  to obtain effective redress for the wrongs done to them.  Furthermore, even if Class
16  members could afford such individualized litigation, the court system could not.
17  Individualized litigation would create the danger of inconsistent or contradictory
18  judgments arising from the same set of facts.  Individualized litigation would also
19  increase the delay and expense to all parties and the court system from the issues
20  raised by this action.  By contrast, the class action device provides the benefits of
21  adjudication of these issues in a single proceeding, economies of scale, and
22  comprehensive supervision by a single court, and presents no unusual management
23  difficulties under the circumstances here.

24      81.   Plaintiff seeks preliminary and permanent injunctive and equitable relief
25  on behalf of the entire Class, on grounds generally applicable to the entire Class, to
26  enjoin and prevent Defendants from engaging in the acts described, and requiring
27  Defendants to provide full restitution to Plaintiff and Class members.

28

82.     Unless a Class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiff and Class members.  Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged, and the members of the Class and the general public will continue to be deceived.

83.     Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

## COUNT I
### Violation of Business & Professions Code §17200, *et seq.*
**(Applicable to the Multi-State Class, or Alternatively, to the California-Only Class)**

84.     Plaintiff and Class members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

85.     Plaintiff brings this claim on behalf of himself and on behalf of the California-only Class and on behalf of the Multi-State Class.

86.     As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because he purchased the Product in reliance on Defendants' health benefit representations, but did not receive a Product that promotes these health benefits.  The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising.  In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, making the representations (which also constitutes advertising within the meaning of §17200) and omissions of material facts, as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1711, 1770 and Business & Professions Code §§17200, *et seq.*, 17500, *et seq.*

87.     Plaintiff and the Class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

88.     Defendants' actions also constitute "unfair" business acts or practices because, as alleged above, *inter alia*, Defendants engaged in false advertising, misrepresented and omitted material facts regarding their Vitamin E Products, and thereby offended an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

89.     As stated in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition and truth in advertising laws, resulting in harm to consumers.  Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers.  This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, *et seq*.

90.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

91.     Business & Professions Code §17200, *et seq*., also prohibits any "fraudulent business act or practice."

92.     Defendants' actions, claims, nondisclosures and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200, *et seq*.

93.     Plaintiff and the other Class members have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

94.     As a result of their deception, Defendants have been able to reap unjust revenue and profit.

95.     Unless restrained and enjoined, Defendants will continue to engage in

1    the above-described conduct.  Accordingly, injunctive relief is appropriate.

2         96.    Plaintiff, on behalf of himself, all others similarly situated, and the

3    general public, seeks restitution of all money obtained from Plaintiff and the

4    members of the Class as a result of unfair competition, an injunction prohibiting

5    Defendants from continuing such practices, corrective advertising and all other relief

6    this Court deems appropriate, consistent with Business & Professions Code §17203.

7                                    **COUNT II**

8    **Violations of the Consumers Legal Remedies Act –Civil Code §1750** *et seq.*
     **(Applicable to the California-Only Class)**

9

10        97.    Plaintiff repeats and re-alleges the allegations contained in the

11   paragraphs above, as if fully set forth herein.

12        98.    Plaintiff Dachauer brings this claim individually and on behalf of the

13   California-only Class.

14        99.    This cause of action is brought pursuant to the Consumers Legal

15   Remedies Act, California Civil Code §1750, *et seq.* (the "Act").  Plaintiff is a

16   "consumer" as defined by California Civil Code §1761(d).  Defendants' Vitamin E

17   Products are "goods" within the meaning of the Act.

18        100.  Defendants violated and continues to violate the Act by engaging in the

19   following practices proscribed by California Civil Code §1770(a) in transactions with

20   Plaintiff and the Class which were intended to result in, and did result in, the sale of

21   the Vitamin E Products:

22        (5)    Representing that [the Vitamin E Products have] . . . approval,

23               characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

24                              *       *       *

25        (7)    Representing that [the Vitamin E Products are] of a particular standard,

26               quality or grade . . . if [they are] of another.

27

28
                     FIRST AMENDED CLASS ACTION COMPLAINT
                                    - 26 -

\*        \*        \*

(9)    Advertising goods . . . with intent not to sell them as advertised.

\*        \*        \*

(16)   Representing that [the Vitamin E Products have] been supplied in accordance with a previous representation when [they have] not.


101.   Defendants violated the Act by representing and failing to disclose material facts on the Products' labels and associated advertising, as described above, when they knew, or should have known, that the representations were false and misleading and that the omissions were of material facts they were obligated to disclose.

102.   Pursuant to California Civil Code §1782(d), Plaintiff and the Class seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

103.   Pursuant to §1782 of the Act, by letter dated January 13, 2016, Plaintiff notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.

104.   Defendants failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act.  Therefore, Plaintiff further seeks claims for actual, punitive and statutory damages as appropriate.

105.   Defendants' conduct is fraudulent, wanton and malicious.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment:

1     A.     Certifying the Class(es) as requested herein;

2     B.     Awarding Plaintiff and the proposed Class Members damages;

3     C.     Awarding restitution to Plaintiff and the proposed Class members;

4     D.     Awarding injunctive relief as permitted by law or equity, including

5 enjoining Defendants from continuing the unlawful practices as set forth herein;

6     E.     Awarding statutory and punitive damages, as appropriate;

7     F.     Ordering Defendants to engage in a corrective advertising campaign;

8     G.     Awarding attorneys' fees and costs; and

9     H.     Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

Dated: February 11, 2016

                                     BONNETT, FAIRBOURN, FRIEDMAN
                                                             & BALINT, P.C.

                                     s/ *Patricia N. Syverson*
                                   Elaine A. Ryan (*To be Admitted Pro Hac Vice*)
                                   Patricia N. Syverson (CA SBN 203111)
                                   2325 E. Camelback Rd. Suite 300
                                   Phoenix, AZ 85016
                                   eryan@bffb.com
                                   psyverson@bffb.com
                                   Telephone:  (602) 274-1100

                                   BONNETT, FAIRBOURN, FRIEDMAN
                                   & BALINT, P.C.
                                   Manfred P. Muecke (CA SBN 222893)
                                   600 W. Broadway, Suite 900
                                   San Diego, California 92101
                                   mmuecke@bffb.com
                                   Telephone:  (619) 756-7748

                                   BOODELL & DOMANSKIS, LLC
                                   Stewart M. Weltman (*To be Admitted Pro Hac Vice*)
                                   Max A. Stein (*To be Admitted Pro Hac Vice*)
                                   353 North Clark St., Suite 1800
                                   sweltman@boodlaw.com
                                   mstein@boodlaw.com

1

Chicago, Illinois  60654
Telephone:   (312) 938-1670

2

GOLDMAN SCARLATO & PENNY, P.C.

3

Brian D. Penny (*To be Admitted Pro Hac Vice*)
Laura K. Mummert (*To be Admitted Pro Hac Vice*)
penny@lawgsp.com

4

mummert@lawgsp.com
101 E. Lancaster Ave, Suite 204

5

Wayne, PA 19087
Telephone:  484-342-0700

6

7

*Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I, hereby certify that on February 11, 2016, I electronically filed the foregoing

4   with the Clerk of the Court using the CM/ECF system which will send notification

    of such filing to the e-mail addresses denoted on the Electronic mail notice list.

5

6        I certify under penalty of perjury that the foregoing is true and correct.

    Executed this 11th day of February 2016.

7

8                                            /s/ *Patricia N. Syverson*

9                                            Patricia N. Syverson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28