1  Robert M. Andalman (admitted *pro hac vice*)
   randalman@aandglaw.com
2  Rachael Blackburn (admitted *pro hac vice*)
   rblackburn@aandglaw.com
3  A&G LAW LLC
   542 South Dearborn Street, 10th Floor
4  Chicago, Illinois 60605
   Telephone:  312-348-7629
5  Facsimile: 312-279-4529

6  William A. Delgado (Bar No. 222666)
   wdelgado@willenken.com
7  WILLENKEN WILSON LOH & DELGADO LLP
   707 Wilshire Blvd., Suite 3850
8  Los Angeles, California 90017
   Telephone:  213-955-9240
9  Facsimile:  213-955-9250

10 Attorneys for Defendants
   NBTY, INC. and NATURE'S BOUNTY, INC.
11

12                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
13
   PAUL DAVID DACHAUER, on behalf of        CASE NO.: 3:16-CV-00216-VC
14 Himself and All Others Similarly Situated,
                                            Hon. Vince Chhabria
15             Plaintiff,
                                            **DEFENDANTS NBTY, INC.'S AND**
16 v.                                       **NATURE'S BOUNTY, INC.'S NOTICE**
                                            **OF MOTION AND MOTION FOR**
17 NBTY, INC. and NATURE'S BOUNTY,          **SUMMARY JUDGMENT;**
   INC.,                                    **MEMORANDUM OF POINTS AND**
18                                          **AUTHORITIES**
               Defendants.
19                                          **[Separate Supporting Declarations Filed**
                                            **Concurrently Herewith]**
20
                                            Date:      February 16, 2017
21                                          Time:      10:00 a.m.
                                            Ctrm:      4—17th Floor
22
                                            Complaint Filed:   March 7, 2016
23                                          Trial Date:        Not yet set
24
25
26
27
28

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 16, 2017 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, Riverside, California, 94102, Defendants NBTY, Inc. and Nature's Bounty, Inc. (collectively, "NBTY" or "Defendants") will move the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

The bases for this motion, which are more fully set forth in the accompanying Memorandum of Points and Authorities, include the following: (a) the undisputed facts show no genuine issue of fact exists with respect to any of Plaintiffs' claims, and (b) the undisputed facts show that Plaintiff's claims are preempted by Federal law so that Defendants are entitled to judgment in their favor.

This motion is based on this Notice, the Memorandum of Points and Authorities filed herewith, the concurrently filed declarations of Dr. Richard Bruno and Rachael Blackburn, the records and pleadings on file herein, any matter of which the Court may take judicial notice, and on such other evidence as may be presented in the hearing on this matter.

Dated:  December 22, 2016          A&G LAW LLC


                                   By:  /s/ Robert M. Andalman
                                        Robert M. Andalman
                                        Attorneys for Defendants
                                        NBTY, INC. and NATURE'S BOUNTY, INC.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

    I.      INTRODUCTION ...............................................................................1

    II.     STATEMENT OF FACTS ...................................................................2

          A.     NBTY's Vitamin E Products ...................................................2

          B.     Dachauer's Purchase of Vitamin E and Litigation ................2

          C.     NBTY's Structure/Function Claims are Substantiated .........5

          D.     Plaintiff's Expert Makes a Different Point Not Claimed By NBTY's Label ......................................................................6

ARGUMENT ........................................................................................................11

          A.     Summary Judgment Standard ...............................................11

          B.     Summary Judgment is Proper Here Because There is No Evidence that the Label's Structure/Function Claims are False or Misleading...12

          C.     Dachauer's Claims Are Expressly Pre-empted Because He Confounds the Distinction Between Structure/Function and Disease Claims ...................................................................18

CONCLUSION.....................................................................................................23

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 12

*Bohn v. Pharmavite, L.L.C.*, No. CV 11-10430-GHK (AGRx), 2013 U.S. Dist.
    LEXIS 125006 (C.D. Cal. Aug. 7, 2013) ........................................................ 6

*Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427 (9th Cir. 1991)...........................21

*Bronson v. Johnson & Johnson, Inc.*, No. C 12-04184 CRB, 2013 U.S. Dist. LEXIS
    54029 (N.D. Cal. Apr. 16, 2013) ................................................................ 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 12

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ............................................ 16

*Eckler v. Wal-Mart Stores, Inc.*, No. 12-CV-727-LAB-MDD, 2012 U.S. Dist. LEXIS
    157132, (S.D. Cal. Oct. 31, 2012) ..............................................................15

*Feder v. Frank (In re HP Inkjet Printer Litig.)*, 716 F.3d 1173 (9th Cir. 2013) ..................... 21

*Freeman v. Time, Inc.,* 68 F.3d 285 (9th Cir.1995) ...................................................17

*Johns v. Bayer Corp.*, No. 9cv1935 AJB (DHB), 2013 U.S. Dist. LEXIS 51823
    (S.D. Cal. Apr. 10, 2013) ...................................................... 12-13, 14, 15, 16

*Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131 (E.D.N.Y. 2015) ........................ 15, 16

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002) .................................................. 16-17

*Kaufman v. CVS Caremark Corp.*, 836 F.3d 88 (1st Cir. 2016) ........................ 19, 20

*Khasin v. R.C. Bigelow, Inc.*, No. 12-cv-02204-WHO, 2016 U.S. Dist. LEXIS 115850
    (N.D. Cal. Aug. 29, 2016) ............................................................ 18

*Leoni v. State Bar*, 39 Cal. 3d 609 (1985) ............................................... 17

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ................................... 12

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. CV 12-cv-04457-SC, 2015 U.S. Dist.
    LEXIS 97815 (N.D. Cal. July 27, 2015)............................................... 17

*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.*, 107
    Cal. App. 4th 1336 (2003) ........................................................ 13-14

*Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616 (4th Cir. 2015) ...................22

*Punian v. Gillette Co.*, No. 14-CV-05028-LHK, 2016 U.S. Dist. LEXIS 34164 (N.D.
    Cal. Mar. 15, 2016) ............................................................... 17

*Ries v. Ariz. Bevs. USA LLC*, No. 10-01139 RS, 2013 U.S. Dist. LEXIS 46013 (N.D. Cal. Mar. 28, 2013) ................................................................................................ 17

*Scheuerman v. Nestle Healthcare Nutrition*, No. 10-5628 (FSH)(PS), 2012 U.S. Dist. LEXIS 99397 (D.N.J. July 16, 2012) ............................................................... 14

*Stanley v. Bayer Healthcare L.L.C.*, No. CASE NO. 11cv862-IEG(BLM), 2012 U.S. Dist. LEXIS 47895 (S.D. Cal. Apr. 3, 2012) .................................... 12, 14, 17

*Trujillo v. Walgreen Co.*, No. 13 CV 1852, 2013 U.S. Dist. LEXIS 112404 (N.D. Ill. Aug. 9, 2013) ........................................................................................................ 23

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008) .................................... 17

*Yumul v. Smart Balance, Inc.*, No. CV 10-00927 MMM (AJWx), 2011 U.S. Dist. LEXIS 109952 (C.D. Cal. Mar. 14, 2011) ................................................................22

**Statutes**

21 U.S.C. § 162 .......................................................................................................... 11

21 U.S.C. § 196 .......................................................................................................... 10

21 U.S.C. § 301 ....................................................................................................... 1, 4

21 U.S.C. § 343 ..................................................................................................... 1, 18

21 U.S.C. §343-1(a)(5) ...............................................................................................19

21 U.S.C. § 343(r)(6) ...................................................................................... 19, 21, 22

21 U.S.C. § 343(r)(7) and (s) ..................................................................................... 18

21 U.S.C. § 371 .......................................................................................................... 18

21 U.S.C. § 393 .......................................................................................................... 18

21 U.S.C. § 403(r)(6) .................................................................................................. 10

Cal. Bus. and Prof. Code, 21 U.S.C. § 17200 ....................................................... 1, 12

Cal. Civ. Code § 1572 ................................................................................................. 13

Cal. Civ. Code § 1770 ................................................................................................. 12

Civ. Code, 21 U.S.C. § 1750 ....................................................................................... 1

**Other**

1990 U.S.C.C.A.N. 3336, 3337 ...................................................................................22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21 C.F.R. § 101.93(f) & (g) ..................................................... 19

65 Fed. Reg. at 1012 ............................................................. 20

65 Fed. Reg. at 1014 ............................................................. 20

65 Fed. Reg. at 1018 ............................................................. 21

Fed. R. Civ. P. 56(a) ............................................................. 11

H.R. Rep. No. 101-538 (1990)................................................. 22

# I.    INTRODUCTION

NBTY, Inc. and Nature's Bounty, Inc.'s (collectively, "NBTY") vitamin E supplement labels say that vitamin E "promotes" heart health, immune health and circulatory health.[1] These structure/function claims are true and are consistent with the Nutrition Labeling and Education Act (the "NLEA"), 21 U.S.C. § 343 *et seq.* and related FDA regulations. Vitamin E, including in supplement form, is an antioxidant that promotes the structure and function of the heart, circulatory and immune systems in various ways.

This lawsuit – one of a series, none of which has prevailed – was nonetheless filed in the name of Paul Dachauer ("Dachauer"). It alleges that NBTY's labels are false and misleading in violation of the California Unfair Competition Law (the "UCL"), Bus. and Prof. Code § 17200, and the Consumer Legal Remedies Act (the "CLRA"), Civ. Code § 1750. Discovery has confirmed that the complaint's theory is that the labels' structure/function claims are false because they imply that vitamin E will treat, cure or prevent disease or death. Yet Dachauer himself testified that he did not understand the label on the NBTY product he purchased to mean that the supplements would treat or prevent disease. The labels make no claims about preventing disease or death, and instead specifically disclaim any impact on disease.

It is now evident that: (a) the structure/function claims on NBTY's labels are substantiated; (b) there is no evidence the labels are false or misleading; and (c) the complaint's state-law claims would impose standards on NBTY not identical, and contradictory, to the federal rules for nutrition supplement labeling, such that these claims are expressly preempted by the NLEA and the Federal Food, Drug, and Cosmetic Act (the "FDCA"), 21 U.S.C. § 301 *et seq*. At best, this lawsuit is an argument over whether an impact on disease or death is necessary to make a structure/function claim on a nutritional supplement label. The FDA has resolved this argument against the theory of the complaint and courts have consistently held that private plaintiffs cannot litigate the adequacy of label substantiation under the UCL or CLRA. In these

---

[1]    On November 14, 2016, NBTY, Inc. changed its name to Nature's Bounty Co. For simplicity's sake, and to conform with the pleadings thus far in this case, we nonetheless use "NBTY" to refer collectively to the defendants.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   circumstances and on this record, summary judgment is properly granted in favor of NBTY.

2   ## II.   STATEMENT OF FACTS

3   ### A.   NBTY's Vitamin E Products

4   NBTY manufactures and sells vitamin products, including vitamin E products, under the

5   brand Nature's Bounty to retailers who then sell those products to consumers. Answer, Dkt. 46

6   ¶¶ 49-50. At issue are eight Nature's Bounty brand vitamin E products in dosages exceeding 200

7   IU. *Id.* ¶ 1. The labels on these products include the subject structure/function claims. Complaint,

8   Dkt. 25 Ex. A (copies of labels). These claims were not made haphazardly. Rather, before

9   making any such claim, NBTY ensures that there is scientific support for it, consistent with a

10  standard operating procedure designed for this purpose. Declaration of Rachael Blackburn

11  ("Blackburn Decl."), Ex. 1, at 79:8-18 (Mitmesser Tr.). That procedure includes ensuring that the

12  ingredient is safe and then "look[ing] into the evidence, the totality of the evidence within the

13  field of nutrition and science to determine if a specific claim can be made." *Id.* at 79:19-80:9.

14  NBTY identifies "clinical endpoints" that reflect the structure and function of the relevant body

15  systems (for example, the heart, circulatory and immune systems in the case of vitamin E) and

16  then reviews relevant scientific data to determine what claims are appropriately made based on

17  supplementation's impact on those endpoints. *Id.* 80:6-82:22; 84:11-90:13; 91:11-95:10. NBTY

18  then maintains a "structure/function" database that summarizes allowed claims and the support

19  for them, though as discussed below there is additional evidence that substantiates the claims,

20  too. *Id.* at 66:22-67:10.

21  ### B.   Dachauer's Purchase of Vitamin E and Litigation

22  Dachauer is 47 years old. Blackburn Decl., Ex. 2, at 54:18-19 (Dachauer Tr.). He

23  describes himself as in "pretty good" health with no personal or family history of heart disease.

24  *Id.* at 28:5-11. Dachauer purchased only a single bottle of Nature's Bounty vitamin E in June

25  2015. *Id.* at 85:2-4. For nearly ten years, Dachauer has used a Centrum-branded multivitamin

26  that includes vitamin E. *Id.* at 66:1-67:9; Blackburn Decl., Ex. 3 (Dachauer Dep. Ex. 6,

27  photograph of Centrum bottle); Blackburn Decl., Ex. 4 (print-out from Centrum website

28  describing vitamin E as "What's Inside Centrum" and further describing the structure/function

benefits of vitamin E to promote healthy heart, circulatory and immune function as made by that company).

Dachauer has no reason, other than what his counsel has told him, to dispute the structure/function claims on the NBTY label. Blackburn Decl., Ex. 2. at 81:24-83:3 (Dachauer Tr.) ("Q. Other than what your lawyers have said …, do you have any independent basis to believe that vitamin E doesn't generally promote a healthy heart? A. No, I personally do not. Q. Okay. And other than what your lawyers have told you, do you have any reason to believe that vitamin E does not promote immune health? A. No."). Neither has Dachauer had any conversations with anyone about vitamin E labels or read any studies on the subject. *Id.* at 84:7-13.

Dachauer is involved in this case because a friend of his – a man named Peter Crane – is a paid "finder" for counsel in the case. Crane posts on social media websites, like Facebook, trolling for plaintiffs. *See* Blackburn Decl., Ex. 5 (Dachauer Dep. Ex. 2, Facebook printout). In Dachauer's case, he "may" have seen this posting, but he specifically recalled that he and Crane were having dinner and Crane told him he was "working" on a vitamin E case and if Dachauer purchased vitamin E supplements he should contact Patti Syverson, one of the lawyers here. Blackburn Decl, Ex. 2 at 24:9-25:7; 26:1-11; 99:25-100:5 (Dachauer Tr.); *see also id.* at 27:2-22. Dachauer reached out to Ms. Syverson, who sent him an engagement letter within weeks of Dachauer's purchase of the NBTY vitamin E. *Id.* at 27:23-25; 101:15-25. At first Dachauer denied knowing that his friend, Crane, would be paid for finding him, *id.* at 102:7-10, but after a deposition break and upon cross-examination by his own counsel he conceded that he knew his friend was going to be paid "a referral fee," *id.* at 103:7-15.

Dachauer claims to have purchased the supplements on June 17, 2015, which he says was "a couple weeks" before his dinner with Crane. *Id.* at 45:21-24. According to Dachauer, he was browsing in a Rite-Aid store and "just happened to pick Nature's Bounty" vitamin E. *Id.* at 41:21-42:8; *see also id.* at 27:5-9 (testifying it was "just a coincidence" that he had purchased the Nature's Bounty brand). Dachauer testified that he was not specifically concerned about his heart health or immune health when he purchased the product, but made the purchase because he is

1   "getting older" and that it was "[p]robably time to start really taking care of [him]self." *Id.* at

2   43:9-15. However, as noted, Dachauer was already taking a multi-vitamin that included vitamin

3   E, among other supplements. *Supra* at 2-3.

4       While each of the eight Nature's Bounty brand vitamin E supplement products has a

5   slightly different label, Complaint, Dkt. 25, Ex. A, Dachauer himself purchased only one such

6   product: a bottle of 1000 IU vitamin E supplements, Blackburn Decl., Ex. 2, at 70:4-11

7   (Dachauer Tr.) The label on that product (hereinafter, the "Label"), states that vitamin E

8   "promotes" "immune function" and "healthy heart." Blackburn Decl., Ex. 6 (Label, copied from

9   Dkt. 25, Ex. A). It further describes how vitamin E works, explaining not just that "Vitamin E

10  promotes immune function and helps support cardiovascular health," but also how the nutrient

11  does so, stating: "Vitamin E helps fight cell-damaging free radicals in the body" that "can

12  contribute to oxidative stress, which in turn may contribute to the premature aging of cells." *Id.*

13  All of the Label statements about how vitamin E works include an asterisk that refers to a

14  disclaimer required by the FDCA, set off in a box and in bold font that: "This product is not

15  intended to diagnose, treat, cure or prevent any disease." *Id.*

16      Dachauer testified he understood the difference between a claim about disease prevention

17  and one about overall health at the time he purchased the vitamin E supplements. Blackburn

18  Decl., Ex. 2, at 72:14-73:22 (Dachauer Tr.). He did not understand the Label to suggest that

19  vitamin E supplements would prevent a heart attack or other disease. *Id.* at 73:13-74:6 (testifying

20  that he did not buy the supplements because of their impact on disease since "[i]f you had a

21  disease, I don't think vitamin E is going to do anything" and stating his understanding from the

22  Label that vitamin E "promotes pretty much your heart and immune system" but not that it

23  would "stop a heart attack."). Dachauer further testified he understood that the supplements

24  would only be effective to "help with your heart for long-term care" after "taking" them over the

25  "long term." *Id.* at 72:14-73:11; 86:7-15. Similarly, regarding the claim that vitamin E "promotes

26  immune function," Dachauer did not understand that claim to mean that the supplements would

27  prevent him from getting any particular disease; he expected only that the supplements would

28  make his immune system "stronger" or "more resilient." *Id.* at 87:11-20. Dachauer agreed that

1    "vitamin[s] aren't medicine." *Id.* at 86:24-25. Dachauer only took six of the supplements in the

2    bottle. *Id.* at 85:25-86:1.

3         C.    **NBTY's Structure/Function Claims are Substantiated**

4         The complaint is clear that: "Plaintiff is not contending that Defendants are making

5    illegal disease claims under the FDCA," but "[r]ather, Plaintiff contends that Defendants'

6    structure function claims … are false." Dkt. 25, ¶¶ 17-18. As discussed further below, it is

7    Dachauer's burden to demonstrate that those structure/function claims are, indeed, actually false.

8    Nonetheless, for context, NBTY does not rest on its own structure/function database, described

9    above, but provides the Declaration of Richard S. Bruno (the "Bruno Decl.") to explain how and

10   why the structure/function claims on the label of the vitamin E supplements that Dachauer

11   purchased are substantiated.

12        Dr. Bruno is a Ph.D. nutritionist and dietician with extensive research experience who has

13   written 75 peer-reviewed articles in scientific journals about how nutritional supplements

14   function in the body, including vitamin E. Bruno Decl., ¶ 1. Regarding the Label, he explains

15   that "[t]he structure/function claims described on the label are supported by reliable and

16   competent scientific evidence." *Id.* ¶¶ 2-3, 11. He also explains how this is so, that is, how the

17   evidence, including randomized controlled trials ("RCTs"), establish that vitamin E works in the

18   body as an antioxidant and otherwise to "promote" the structures and functions of the heart,

19   circulatory and immune systems. *Id*. ¶¶ 4-8. Dr. Bruno makes no distinction in this regard

20   between the nutrient and the supplements whose only active ingredient is vitamin E. *Id.* ¶ 2.

21        In sum, Dr. Bruno explains that the heart and circulatory systems have multiple structures

22   and functions, which include maintenance of a system of blood vessels. *Id.* ¶ 4-8. Those blood

23   vessels depend for their function on a structure called the endothelial lining. *Id.* ¶ 7. That lining is

24   thus a structure of the heart and circulatory system, the maintenance of which is a function of

25   those systems. *Id.* Other functions of the heart and circulatory system are (a) management of

26   inflammation; and (b) control of "oxidative stress," the latter of which is an imbalance in the

27   systems that can impede the other functions of the heart, circulatory and immune systems. *Id.* ¶¶

28   4-6, 8. These overlap with function of the immune system. *Id.* ¶ 4, 8. An additional structure of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  the immune system, which helps to maintain to healthy function of the heart, too, are immune
2  cells that are known as monocytes that are involved with managing inflammation. *Id.* ¶ 8.

3       Vitamin E, including but not limited to, because of its established role as an antioxidant,
4  promotes and supports each of these structures and functions of the heart, circulatory and
5  immune systems. For example, it has been proven – including in RCTs – that vitamin E
6  supplementation reduces LDL cholesterol oxidation, which is a cause of damage to the
7  endothelial lining. *Id.* ¶ 4-7. A synthesis of 46 different RCTs that examined studies of the
8  impact of vitamin E supplementation on endothelial function – a so-called "meta-analysis" – thus
9  concluded that vitamin E supplementation significantly improves that function. *Id.* ¶ 7. Vitamin
10  E supplementation has likewise been demonstrated to help the relevant body systems to manage
11  inflammation and reduce oxidative stress. *Id.* ¶¶ 5, 8. Vitamin E supplementation also has been
12  demonstrated to improve monocyte function. *Id.* ¶ 8. As Dr. Bruno explains, in each of these
13  ways, vitamin E "promotes" the structure and function of the heart, circulatory and immune
14  systems. Dr. Bruno reviewed NBTY's substantiation file for vitamin E and concluded that the
15  studies there were consistent with his own, independent research. *Id.* ¶ 12.

16       **D.**     **Plaintiff's Expert Makes a Different Point Not Claimed By NBTY's Label**

17       The complaint depends entirely on the testimony of Dr. Edgar Miller about what is
18  required to substantiate supplement label claims. Dr. Miller is Plaintiffs' counsel's expert in this
19  and two prior vitamin E class actions. Blackburn Decl., Ex. 7, at 27:1-17 (Miller Tr.) (describing
20  *Bohn v. Pharmavite*); 29:3-8 (describing *Bradach v. Pharmavite*); 33:12-19 (explaining Dr.
21  Miller's understanding that both cases were ultimately dismissed).[2] Dr. Miller's theory is that if
22

23      [2]     In the *Bohn* case, class certification was denied because "[t]hat Plaintiff recalled the
24  events in a way that fits the narrative of this lawsuit and failed to conduct basic due diligence,
   when viewed in light of Plaintiff and Weltman's eight-year friendship involving weekly
25  gatherings, become strong indicia of an ongoing conflict." *Bohn v. Pharmavite, LLC*, No. CV 11-
   10430-GHK (AGRx), 2013 U.S. Dist. LEXIS 125006, at *12-13 (C.D. Cal. Aug. 7, 2013) (the
26  reference to "Weltman" is to Stewart Weltman, counsel here and in *Bohn*). In *Bradach*, the court
27  held claims were preempted because the plaintiff testified that, consistent with Dr. Miller's
   testimony, he understood the structure/function claims at issue to mean that vitamin E
28  supplements would prevent disease. Blackburn Decl., Ex. 8, at 3-4 (*Bradach v. Pharmavite LLC*,
   Case No. 2:14-cv-03218-GHK-AGR, Dkt. 202).

1    vitamin E supplementation cannot be proven to be an effective therapy for heart or other

2    diseases, or if it does not reduce incidence of death from all causes, then the Label's

3    structure/function claims must be false. Dr. Miller offers this testimony in ignorance of

4    Dachauer's testimony that he did not understand the Label to be making any claim that vitamin E

5    would prevent or treat disease and without any consideration of the distinction federal law and

6    the FDA draw between disease and structure/function claims.

7            Preliminarily, Dr. Miller agrees that vitamin E acts as an antioxidant in the body. *Id.* at

8    243:2-4 ("Q. Do you agree that it [vitamin E] has an antioxidant function? A. Yes."). He agrees

9    that vitamin E inhibits platelet aggregation in blood vessels. *Id.* at 243:5-7 ("Q. Do you agree it

10   inhibits platelet aggregation? A. Yes."). Dr. Miller also testified to vitamin E's function in

11   managing free radicals and preventing lipid oxidation. *Id.* at 141:15-22. Some of Dr. Miller's

12   own work demonstrates the positive impact of vitamin E supplementation on lipid oxidation,

13   which is a function of the heart and circulatory systems. *See id.* at 141:15-18; 142:9-20;

14   Blackburn Decl., Ex. 9 (Miller Dep. Ex. 3). As he explained it, controlling lipid oxidation is a

15   "surrogate endpoint" relevant to heart health or cardiovascular performance. Blackburn Decl.,

16   Ex. 7, at 141:7-14 (Miller Tr.) ("Q. [I]s reduction of lipid oxidation a sort of surrogate endpoint

17   that one might look at with regard to heart health or cardiovascular performance? A. Yes."). Dr.

18   Miller's peer-reviewed RCT concluded that there was a beneficial impact from vitamin E

19   supplementation on lipid oxidation and that "the results of this trial should be generalizable to

20   individuals who choose to take antioxidant supplements," which in the study included vitamin E

21   and vitamin C. Blackburn Decl., Ex. 9, at 553-54 (Miller Dep. Ex. 3). Yet Dr. Miller dismisses

22   his own conclusions in that work based on the notion that other studies have failed in his

23   estimation to show that vitamin E treats, cures or prevents heart disease. Blackburn Decl., Ex. 7,

24   at 146:3-15 (Miller Tr.).

25           Dr. Miller's conclusion that the Label claims in this case were nonetheless insufficiently

26   substantiated – and even false – is based on his perspective as an epidemiologist. As he

27   explained it, epidemiology is the study of "[p]atterns of disease." *Id.* at 294:1-3. He thus

28   testified: "Q. [A]n epidemiologist is always looking for whether or not there is an impact on

7                  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    disease state; is that fair? A. They are – yes. Generally they are looking on – for clinical

2    endpoints. Q. And by clinical endpoint, you mean disease – A. Yeah. Q. – or death A. Yes." *Id.*

3    at 294:7-16. Dr. Miller agreed that vitamin E might have an impact on a recognized structure or

4    function of the body, but not an impact on disease or death. *E.g. id.* at 61:1-9 (testifying

5    "absolutely" that a vitamin could "have a positive impact on the immune system without having

6    impact on disease"). For him, however, that would not support a structure/function claim.

7    Instead, from his perspective, this would only mean that the identified structure or function has

8    "failed" as a surrogate marker for disease, which according to Dr. Miller is the only material

9    endpoint. *Id.* at 293:8-25 (recognizing that there are studies demonstrating vitamin E's positive

10   impact on lipid oxidation, but concluding that if a corresponding impact on disease is absent,

11   "[t]hat's a classic epidemiological failure").

12        Dr. Miller clarified this perspective when he testified that it would be "false" for any

13   nutritional supplement to claim support for the circulatory or immune systems without

14   "[s]cientific evidence demonstrating an impact on disease." *Id.* at 59:5-17. Notably, Dr. Miller

15   conceded that he has never read any of the FDA publications relating to the rules for labeling

16   nutritional supplements. *Id.* at 56:16-22. He admitted that he did not even know what

17   "structure/function claim" means. *Id.* 56:23-25 ("Q. Do you know what a structure function

18   claim is? A. No.") He further conceded that he had no knowledge about the distinction between a

19   structure/function claim and a disease claim. *Id.* at 57:1-20 ("Do you know how the FDA defines

20   a disease claim with regard to supplement labels? A. I'm not familiar with the – no, I don't. Q. I

21   take it you don't have any understanding of the distinction the FDA draws between structure

22   function and disease claims?  A. I – I can guess what that means, but I'm not – I haven't read the

23   regulations on that, what distinguishes. Q. So you don't know? Do you know? A. No.").

24        Dr. Miller never reviewed the Label at issue, did not examine Dachauer or know his age,

25   health or family history, and did not even know the dosage of vitamin E that Dachauer

26   purchased. *Id.* at 47:10-24; 50:4-23. Dr. Miller proceeded on the assumption that Dachauer

27   purchased vitamin E "as a prevention measure to protect him against heart disease," *id.* at 51:14-

28   18, notwithstanding that Dachauer himself testified to the contrary, Blackburn Decl., Ex. 2, at

72:14-73:11 (Dachauer Tr.).

Predictably in light of his epidemiological perspective, Dr. Miller opines that the Label claims that the supplements "promote" the heart, circulatory and immune systems are "false" by reference to studies in which the pre-specified studied "endpoints" were disease or death. As he explained it, "I limited – I limit my – my review, primarily to [studies of] clinical endpoints," that is, "heart attack, stroke, death." Blackburn Decl., Ex. 7, at 103:22-104:13 (Miller Tr.); *see also id.* at 246:2-19 (same). Thus, he testified about the Label's "promotes" heart and circulatory health claims: "Q. So is it your testimony that without evidence of an impact on disease or death … a label cannot say the product promotes heart health or circulatory health? A. That's my opinion. Q. Okay. A. Yeah. Without evidence, it shouldn't be stated. Yeah. Q. And when you say 'without evidence,' you mean without evidence of an impact on disease or death? A. Yes. On clinical endpoints. Yeah." *Id.* at 101:23-102:10. Similarly, concerning the "promotes" immune health claim, he testified: "Q. You said in your understanding of immune health, to make that claim it [taking the vitamin E supplement] would be like taking a medication that reduces infection? A. Yeah. Q. So in order to make that claim, the product would have to work in that manner; is that it? A. Yes." *Id.* at 103:8-15. None of the studies Dr. Miller relied upon had a pre-specified endpoint relating to the structure or function of the immune system, as opposed to disease or death. *Id.* at 108:5-10.

Consistent with his opinion that structure/function claims require evidence of impact on disease or death, Dr. Miller relies on studies of the pre-specified endpoints of disease and death, what he calls "clinical endpoints," and not simply the structure or function of body systems. Consistent with those studied endpoints, the studies on which he relies were not of healthy people in the general population. Instead, the study populations were persons who already had experienced heart attacks or other disease events (so-called "secondary prevention trials") or else persons who displayed risk factors for disease ("primary prevention trials"). *Id.* at 274:4-14; *see also id.* at 89:2-14 (explaining that primary prevention trials "are trying to find people who are going to have the endpoint [*i.e.*, disease or death] within the [five-year] trial period"). Though he draws conclusions about the general population, and about Dachauer (about whom he

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  confessedly knew nothing), Dr. Miller testified that the results of these studies are "only

2  generalizable to the people that you enroll in the study. And it's speculation to say that it's

3  generalizable to others who don't meet the – those criteria for the study." *Id.* at 65:4-7.

4       Dr. Miller further testified to his belief that "vitamin E supplementation in excess of 15

5  mg per day is likely to [be] harmful to one's health and healthy persons should not take vitamin

6  E supplements in excess of 15 milligrams per day." *Id.* at 116:25-117:6. This is wildly

7  inconsistent with the authoritative statement of safe "upper limits" for vitamin E supplementation

8  published by the National Academies of Sciences, Engineering, and Medicine, formerly known

9  as the Institute of Medicine (IOM), which provides for 1000 to 1500 IU daily, depending on the

10 form of vitamin E. Bruno Decl., ¶ 10 (further providing a conversion chart of "mg" to "IU" that

11 demonstrates Miller's number is approximately 1% of the IOM upper limit); *see also* Blackburn

12 Decl., Ex. 7, at 231:4-232:8 (Miller Tr.) (acknowledging authoritative IOM upper limit).

13      Dr. Miller's opinion about "harm" from vitamin E is based solely on so-called meta-

14 analyses. These are statistical analyses of other studies, which the FDA has described as

15 "background information," placing these analyses beneath "testimonial and anecdotal evidence"

16 in the agency's list of such "background" sources. Blackburn Decl., Ex. 10, at II.D (FDA

17 Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section

18 403(r)(6) of the Federal Food, Drug, and Cosmetic Act). The FDA states that meta-analyses are

19 useful primarily to collect relevant underlying studies. *Id.*

20      Dr. Miller relied exclusively on meta-analyses conducted by a group he led and another

21 led by a Prof. Bjelakovic, though he admitted that there were at least four other groups that

22 reached different conclusions in meta-analyses based on the same data, specifically that vitamin

23 E supplementation had no impact one way or another on all-cause mortality. Blackburn Decl.,

24 Ex. 7, at 195:4-197:5 (Miller Tr.). He conceded that his report did not account for these different

25 analyses. *Id.* Ultimately, he further conceded that "there's a lot of disagreement," and certainly

26 "no consensus," on this point. *Id.* at 196:14-17; 197:1-5 ("Q. So there is no consensus that it

27 causes harm? A. No, there is no consensus."). Dr. Miller also did not consider the National

28 Institute of Health's statement in its published "Fact Sheet" about vitamin E, which cites to the

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   Miller and Bjelakovic meta-analyses but states:

> The implications of these analyses for the potential adverse effects of high-dose vitamin E supplements are unclear. Participants in the studies included in these analyses were typically middle-aged or older and had chronic diseases or related risk factors. These participants often consumed other supplements in addition to vitamin E. Some of the studies analyzed took place in developing countries in which nutritional deficiencies are common. *A review of the subset of studies in which vitamin E supplements were given to healthy individuals for the primary prevention of chronic disease found no convincing evidence that the supplements increased mortality.*

Blackburn Decl., Ex. 11 (NIH "Fact Sheet") (emphasis added). When the NIH statement was read to him in his deposition, he simply disagreed with it. Blackburn Decl., Ex. 7, at 233:14-235:18 (Miller Tr.).

The studies that underlay the meta-analyses on which Dr. Miller relied, like those that Dr. Miller otherwise relies upon in this case, evaluated the impact on disease or cardiovascular-related death of vitamin E supplementation and they did so for populations "at risk for disease and [who] have a concentration of risk factors for disease." *Id.* at 162:21-163:14. Though the meta-analyses themselves examined RCTs that studied vitamin E supplementation's impact on disease or cardiovascular related deaths, the meta-analyses then drew conclusions about vitamin E's impact on mortality from all possible causes. In this sense, the meta-analyses drew conclusions about one thing (all-cause mortality) from studies of something else (cardiovascular disease). *See* Bruno Decl. ¶ 9. In fact, a majority of studies and opinions conclude that taking vitamin E supplements alone has no impact on all-cause mortality. *Id.* (discussing studies). Moreover, similar to Dr. Miller's opinions based on whether vitamin E supplements are an effective therapy that would prevent disease or cardiovascular death, the issue of whether vitamin E supplementation impacts all-cause mortality (in effect, whether it makes people live longer) goes far beyond the structure/function claims on NBTY's labels.

## ARGUMENT

### A.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) authorizes summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). Once a moving party makes a prima

facie case for summary judgment, the burden shifts so that "[a] non-moving party who bears the burden of proving at trial an element essential to its case must sufficiently establish a genuine dispute of fact with respect to that element or face summary judgment." *Stanley v. Bayer Healthcare LLC*, No. 11cv862-IEG(BLM), 2012 U.S. Dist. LEXIS 47895, at *7 (S.D. Cal. Apr. 3, 2012), appeal dismissed (June 19, 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Summary judgment cannot be avoided by relying on "conclusory allegations" in declarations. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Further, a "mere existence of a scintilla of evidence in support of [the nonmovant's] position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. Summary Judgment is Proper Here Because There is No Evidence that the Label's Structure/Function Claims are False or Misleading

Summary judgment is properly granted to NBTY and against Dachauer because the Label's structure/function claims are substantiated and there is no evidence that those claims are false or misleading. Dr. Miller, on whose testimony the case depends, admits that vitamin E positively impacts the structure and function of the relevant body systems. His own study of vitamin E supplementation's benefit to endothelial function provides relevant substantiation. What remains is a debate over whether evidence that vitamin E prevents disease or death is required as _additional_ substantiation to support a claim about structure or function. While the FDA has resolved that debate, precedent further clearly holds that neither the UCL nor the CLRA are properly utilized by private plaintiffs to litigate the adequacy of substantiation.

In this regard, the UCL prohibits any "unlawful, unfair or fraudulent business act or practice [in addition to any] unfair, deceptive, untrue or misleading advertising," Cal. Bus. & Prof. Code §§ 17200, whereas the CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices," Cal. Civ. Code § 1770. Applied in cases challenging the truth of structure/function claims on nutritional supplement labels, both statutes require at the threshold that the plaintiff propound evidence that the specific claim is actually false: it is not sufficient to challenge the adequacy of a defendant's substantiation. *Johns v. Bayer Corp.*, No. 09cv1935 AJB

1  (DHB), 2013 U.S. Dist. LEXIS 51823, at *105 (S.D. Cal. Apr. 10, 2013) (granting summary

2  judgment). This is because, under established authorities, "[p]rivate individuals may not bring an

3  action demanding substantiation for advertising claims." *Id.*; *see also Bronson v. Johnson &*

4  *Johnson, Inc.*, No. C 12-04184 CRB, 2013 U.S. Dist. LEXIS 54029, at *23 (N.D. Cal. Apr. 16,

5  2013) (*Bronson I*) (citing *National Council Against Health Fraud, Inc. v. King Bio*

6  *Pharmaceuticals, Inc*., 107 Cal. App. 4th 1336, 1344-45 (2003)) ("Challenges based on a lack of

7  substantiation are left to the Attorney General and other prosecuting authorities; private

8  plaintiffs, in contrast, have the burden of proving that advertising is *actually* false or

9  misleading.") (emphasis added).[3]

10  *Johns* is instructive. That case concerned various structure/function claims on a

11  multivitamin product. Relevant here, the record in *Johns* specifically included evidence

12  substantiating the function of vitamin E in particular vis-à-vis immune health, though vitamin E

13  was only one of the relevant vitamins in the supplement there. *Johns*, 2013 U.S. Dist. LEXIS

14  51823, at *76 (finding it undisputed that "basic research studies have shown that vitamin E may

15  affect prostate cancer risk by … bolstering the immune system"). The *Johns* plaintiff was

16  represented by some of the same lawyers as Dachauer in this case. As in this case, they

17  attempted in *Johns* to manufacture a triable issue of fact about the truth or falsity of a

18  structure/function claim by reference to studies about supplementation's impact on disease. The

19  court rejected this tactic, granting the defense summary judgment and stating: "Bayer clearly

20  represented [on the product label] that zinc and vitamin E support prostate health, not that the

21  nutrients prevent against or reduce the risk of prostate cancer." *Id.* at *131 (similarly rejecting

22  the relevance of plaintiff's arguments of purported "harm" in that case because the studies of

23

24  [3]     While Dachauer also claims that the Label's structure/function claims are "unlawful,"
"unfair," and "fraudulent," each of these claims is in turn based on the premise that the Label is

25  false and misleading. Complaint, Dkt. 25 ¶ 93. Notably, some of these alternative legal
arguments come with burdens of production and proof that Dachauer could not satisfy. For

26  example, proving "unlawful business practices" by violation of the California fraud statutes that
Dachauer cites, *id.* ¶ 86, requires evidence of fraudulent intent wholly absent here. *See*, *e.g.* Cal.

27  Civ. Code § 1572 ("Actual fraud, within the meaning of this chapter, consists in any of the
following acts, committed by a party to the contract, or with his connivance, with intent to

28  deceive another party thereto…").

1  specific populations in that case did not relate to whether the supplements "support prostate

2  health" in the general population).

3         The *Johns* court determined that, to the extent that the plaintiff attempted to raise

4  concerns about the substantiation for Bayer's label statements, "litigating such an action is not

5  within the providence of private plaintiffs under the UCL and CLRA." *Id.* at *160-61. As the

6  court put it: "in the absence of affirmative evidence that scientific research did not support

7  [Bayer's specific claims], the strength of Bayer's evidence is irrelevant and Plaintiffs' claims are

8  based on 'lack of substantiation' rather than proof of falsity." *Id.* at *163. The same point was

9  made in *Stanley*, *supra*, in which the plaintiff argued that Bayer's statements about its probiotic

10 supplements were provably "false and misleading because 'a majority of data generated in peer

11 reviewed, double blind, placebo controlled studies, relating to probiotics, largely suggests that

12 probiotics have little effect on human digestive or immune health.'" *Stanley,* 2012 U.S. Dist.

13 LEXIS 47895, at *12-14. Granting summary judgment in that case, the court held that it was not

14 enough to argue that the defendants' substantiation was outweighed, but rather the plaintiff must

15 have evidence that Defendants' claims are "actually false" and have no scientific support, not

16 just that Defendants' scientific support was "inadequate." *Id.* Merely identifying countervailing

17 science was not evidence that Bayer's representations were actually false, as necessary to survive

18 summary judgment based on UCL or CLRA claims. *Id*. at 13-14; *see also, e.g., Nat'l Council*

19 *Against Health Fraud, Inc.*, 107 Cal. App. 4th at 1345-46 (private plaintiffs may not shift the

20 burden of production to defendants to prove that studies exist which substantiate their claims);

21 *Scheuerman v. Nestle Healthcare Nutrition*, No. 10-3684 (FSH)(PS), 2012 U.S. Dist. LEXIS

22 99397, at *27 (D.N.J. July 16, 2012) (summary judgment granted where experts offered criticism

23 of defendant's scientific support because this was insufficient to show "no scientific support" for

24 claims).

25         NBTY based its claims on a lengthy substantiation file. Dr. Bruno has further explained

26 how the Label's structure/function claims are substantiated based on his own research. The

27 substantiation of these claims is in fact undisputed, as even Dr. Miller conceded that vitamin E

28 supplementation has a positive impact that promotes structures and functions of the heart,

1  circulatory and immune systems. Dr. Miller's unwillingness to agree that these facts support the

2  structure/function claims on the label absent evidence that vitamin E is a viable therapy to treat,

3  prevent or cure disease is beside the point. The labels did not claim such an impact – and in fact

4  specifically disclaimed it. Moreover, Dachauer himself has testified that he did not understand

5  that the claims on the Label implied any impact on disease. As he put it, "if you're going to have

6  a heart attack, you're going to have a heart attack." Blackburn Decl., Ex.2, at 73:20-22

7  (Dachauer Tr.). Dachauer thus drew a distinction – which Dr. Miller does not – between

8  promoting health and the absence of disease.

9      The fact (and law) is that "health" is more than just the absence of disease, as multiple

10  courts have found. [4] *See Johns*, 2013 U.S. Dist. LEXIS 51823, at *140 ("Here, however, Bayer

11  only represented that lycopene supported a healthy prostate, not that emerging research

12  suggested that lycopene supplementation reduced the risk of prostate cancer."); *Eckler v. Wal-*

13  *Mart Stores, Inc.*, No. 12-CV-727-LAB-MDD, 2012 U.S. Dist. LEXIS 157132, at *26-28 (S.D.

14  Cal. Oct. 31, 2012) (studies showing that glucosamine does not "alleviate the symptoms of

15  osteoarthritis in the hip and knee" did not prove that product claim "[f]ormulated to help

16  [s]upport joint comfort [and] [r]ebuild cartilage and lubricate joints" was false or misleading;

17  noting that Plaintiff improperly "conflates [] two issues, pitching a finding that Equate does little

18  for the symptoms of osteoarthritis [a disease] as a finding that it does nothing for the body's

19  joints at all [promoting structure/function]"); *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 138

20  (E.D.N.Y. 2015) (studies concerning specific impact of vitamins on medical conditions such as

21  CVD, cancer or mortality did not demonstrate that health claims including "immune health"

22  were false or misleading).

23      That a nutritional supplement can promote the structure or function of a body system

24  _____

25  [4]      Dr. Miller's testimony was actually inconsistent on this point. Thus, while he insisted that
    no structure/function claim could be made about promotion of health without corresponding

26  evidence of impact on disease, *supra* at 8, he conceded that health is something more than the
    absence of disease. Blackburn Decl., Ex. 7, at 80:1-4 (Miller Tr.) ("Q: The absence of disease

27  alone is not the defining factor of heart health. Do you agree with that? A: Yes."); 79:3-5 ("Q.
    You agree with the notion that health is broader than simply the absence of disease, correct? A.

28  Yes.").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   without having an impact on disease is the very nature of a structure/function claim. *See Johns,*

2   2013 U.S. Dist. LEXIS 51823, at *82-83 (stating that "*a **structure**/**function** claim does not look*

3   *at the correlation between a particular nutrient and the ability of that nutrient to treat or cure a*

4   *disease. … Instead a **structure**/**function** claim looks at whether a nutrient is essential to the*

5   *function of a particular body system or organ* ….") (emphasis in original). That Dr. Miller's

6   opinion missed this distinction is explained by his frank admission that he did not know what a

7   structure/function claim is and has no knowledge of any distinction between structure/function

8   and disease claims. Blackburn Decl., Ex. 7, at 56:16-57:20 (Miller Tr.). Dr. Miller's opinion

9   accordingly did not take into consideration the very nature of the structure/function claims on the

10  Label. This inconsistency between Dr. Miller's, and the complaint's, position with FDA rules is

11  analyzed below in the discussion that Dachauer's claims are expressly preempted. The

12  dislocation between the structure/function claims on the label and Dr. Miller's insistence on

13  evidence of an impact on death and disease further explains why his opinion provides no

14  evidence that the Label claims are false.[5]

15      In addition to the absence of evidence of falsity, and for related but not identical reasons,

16  there is no evidence in this case that NBTY's Label misled Dachauer. In this regard, the UCL

17  and CLRA prohibit "not only advertising which is false, but also advertising which[,] although

18  true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or

19  confuse the public." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002), as modified (May 22,

20  2002) (quoting *Leoni v. State Bar*, 39 Cal. 3d 609, 626 (1985)). For the misleading prong, claims

---

[5]     There are multiple, additional problems with Dr. Miller's testimony. Dr. Miller relies on meta-analyses without taking into account the underlying studies that comprise those analyses; he extrapolates from sick or at-risk populations to the general public; he fails to consider conflicting evidence (such as the majority of meta-analyses that found no harm from vitamin E); and he draws conclusions related to his underlying data by nothing more than his own *ipse dixit.* For these and other reasons, if this case were to progress, NBTY would move to bar Dr. Miller's testimony consistent with Federal Rules of Evidence 701 and 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See also Kardovich v. Pfizer, Inc.,* 97 F. Supp. 3d 131, 139 (E.D.N.Y. 2015) (dismissing complaint challenging structure/function claims on multivitamin label and specifically declining to rely on an article co-authored by Dr. Miller, finding that "'the science [is] synthesized,' which suggests that the underlying studies have been subjected to second-hand analysis by the article's authors in an effort to distill and harmonize their many different points.").

1   under either the UCL or CLRA are governed by the "reasonable consumer" test, which requires

2   plaintiffs to prove that "members of the public are likely to be deceived." *Williams v. Gerber*

3   *Prods. Co.,* 552 F.3d 934, 938 (9th Cir.2008) (quoting *Freeman v. Time, Inc.,* 68 F.3d 285, 289

4   (9th Cir.1995)). The burden is upon Dachauer to present evidence that NBTY's advertising

5   claims are misleading. *Stanley,* 2012 U.S. Dist. LEXIS 47895, at *27. Dachauer cannot do so,

6   however, if he himself was not misled. *See McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. CV

7   12-cv-04457-SC, 2015 U.S. Dist. LEXIS 97815, at *33 (N.D. Cal. July 27, 2015) (denying

8   motion for class certification where named plaintiffs were not actually misled by "deceptive

9   sales techniques," but rather were charged for services against their wishes); *see also Punian v.*

10  *Gillette Co.*, No. 14-CV-05028-LHK, 2016 U.S. Dist. LEXIS 34164, at *47 (N.D. Cal. Mar. 15,

11  2016) ("[I]n order to be deceived, [one] must have had an expectation or an assumption about the

12  matter in question.").

13          Here, the complaint alleges that the Label was misleading because it suggested that the

14  supplements would cure disease or prevent death when they do not, according to the studies cited

15  in the complaint and relied upon by Dr. Miller. Dkt. 25, ¶ 18-19 (alleging "Defendants' structure

16  function claims … are false" based on "(1) whether Vitamin E supplementation prevents

17  cardiovascular disease or its related conditions, and (2) whether Vitamin E supplementation has a

18  positive effect on all-cause mortality"); ¶ 31 (alleging that "Vitamin E supplements provide no

19  structure function benefit to immune health" absent "any effect on lowering all-cause

20  mortality"). Dachauer has admitted, however, that he was not himself misled in this way.

21  Blackburn Decl., Ex. 2, at 72:14-74:3 (Dachauer Tr.) (testifying that he understood that vitamin

22  E supplements would not prevent a heart attack or other disease and that "[i]f you had a disease,

23  I don't think vitamin E is going to do anything"). In sum, Dachauer agreed that he knew and

24  understood that "vitamin[s] aren't medicine." *Id.* at 86:24-25. Neither is there any extrinsic

25  evidence that other consumers would understand the label differently. *Ries v. Ariz. Bevs. USA*

26  *LLC*, No. 10-01139 RS, 2013 U.S. Dist. LEXIS 46013, at *19-20 (N.D. Cal. Mar. 28, 2013)

27  (granting summary judgment and concluding, "Thus, to prevail, plaintiff must demonstrate by

28  extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to

1    mislead consumers.").

2        On this record therefore, particularly in light of the undisputed evidence that goes beyond

3    what NBTY was required to present concerning the truth of its structure/function claims,

4    summary judgment is properly awarded to NBTY and against Dachauer. *Khasin v. R. C.*

5    *Bigelow, Inc.*, No. 12-cv-02204-WHO, 2016 U.S. Dist. LEXIS 115850, at *8-9 (N.D. Cal. Aug.

6    29, 2016) ("While Bigelow does not have the burden of proving its statements are accurate, it has

7    presented evidence that its label statements are true and therefore, unlikely to mislead or deceive

8    reasonable consumers.").

9        **C.    Dachauer's Claims Are Expressly Pre-empted Because He Confounds the
             Distinction Between Structure/Function and Disease Claims**

10   Now that discovery is completed, it is evident that the complaint seeks to impose on

11   NBTY requirements that are non-identical to those set out by the FDCA and the FDA.

12   Specifically, to prevail, the Court and a jury would have to agree with Dr. Miller that in order to

13   make a structure/function claim that vitamin E, in supplement form or otherwise, "promotes"

14   heart, circulatory or immune health, it is necessary to have evidence that supplementation

15   decreases incidents of disease and death, including death from all causes. Such a requirement

16   would not only be non-identical to the federal law for nutritional supplement labels, it would be

17   directly contradictory. Summary judgment is thus further proper based upon express preemption.

18       In the FDCA, Congress granted the FDA broad power to regulate nutritional supplement

19   labels. The FDA is required to take "appropriate action on the marketing of regulated products in

20   a timely manner …." 21 U.S.C. §§ 393 & 343(r)(7) & (s) (dietary supplement labels a regulated

21   product). The FDA has "authority to promulgate regulations for the efficient enforcement" of the

22   FDCA and conduct related hearings. 21 U.S.C. § 371. The FDA, which acts for the Department

23   of Health and Human Services, is to issue regulations and "act promptly to ban or modify

24   claim[s]" on nutritional supplement labels, as necessary. 21 USC § 343(r)(7).

25       Since 1990, the FDCA, through the NLEA, 21 U.S.C. § 343, has included an express

26   preemption provision that precludes states from imposing, directly *or indirectly*, any requirement

27   as to labels like the one at issue here that is *not identical* to the federal requirement. 21 U.S.C. §

28

1   343-1(a)(5) (unless otherwise provided, "no State or political subdivision of a State may *directly*

2   *or indirectly* establish under any authority or continue in effect as to any food in interstate

3   commerce" any "requirement respecting any claim of the type described in section 343(r)(1) …

4   that is *not identical* to the requirement of section 343(r) ….") (emphasis added).

5          For its part, and following Congress's lead in the FDCA itself, the FDA specifically

6   makes a distinction between structure/function claims and disease claims. As the *Johns* case

7   recognized, *supra*, structure/function claims "refer to the ability of a product to maintain healthy

8   structure or function," while disease claims refer to the ability of a product to have "an effect on

9   a specific disease" or its effects. *See* 21 CFR § 101.93 (f) & (g). Structure/function claims are

10  permitted where the manufacturer of the supplement has "substantiation that such statement is

11  truthful and not misleading" and a proper disclaimer is included that: "'This statement has not

12  been evaluated by the Food and Drug Administration. This product is not intended to diagnose,

13  treat, cure, or prevent any disease.'" 21 U.S.C. § 343(r)(6).

14         In another vitamin E case that has not yet proceeded to summary judgment, and that

15  involves some of the same Plaintiffs' lawyers as here, the First Circuit explained how these rules

16  apply in precisely this circumstance. *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 95 (1st Cir.

17  2016). The case is the first Court of Appeals decision specific to these FDA rules in this context

18  and the panel could not have been clearer that "we do not accept Kaufman's argument that

19  evidence showing a supplement does not reduce heart disease necessarily implies that the

20  nutrient itself has no function in maintaining heart health." *Id.* In language that is dispositive

21  here, the Court went on to state:

22         Congress has expressly specified that sellers of dietary supplements can
           'describe[] the role of a nutrient . . . intended to affect the structure or function in
23         humans,' *id.* § 343(r)(6)(A), even while simultaneously disavowing any claim that
           the product is intended "to . . . prevent any disease," *id.* § 343(r)(6)(C). And the
24         FDA has in turn promulgated a regulation blessing terms like 'promote,'
           'maintain,' and 'support,' so long as the seller has substantiation for the
25         description. *See* Regulations on Statements Made for Dietary Supplements
           Concerning the Effect of the Product on the Structure or Function of the Body, 65
26         Fed. Reg. at 1014. Thus, any nutrient or ingredient that, for example, the heart
           needs might be described as supporting heart health, even if taking the
27         supplement form of the nutrient actually does nothing to improve the health of
           one's heart, as long as the claimed beneficial function is substantiated and the
28         description of the nutrient's role is not misleadingly incomplete. And while

19         DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

> Kaufman plausibly suggests that the drawing of such a distinction between the ingredient's function and its lack of any impact on morbidity likely tricks many consumers who unwittingly think that such a product will reduce the likelihood of poor heart health, this is a form of finesse that the statute and the regulations allow.

*Id.* at 95-96 (suggesting increased consumer "choice" as a reason for allowing such marketing).

In this case, the evidence is that Dachauer was not "tricked." He understood that a claim supplements would "promote" heart, circulatory and immune health did not mean that they would further prevent disease. Moreover, while the Court in *Kaufman* reversed dismissal of the complaint to allow for expert testimony that "might also shed a different light than that cast by the complaint or by a bare reading of the studies unaided by additional context, *id.* at 96, the experts have provided that testimony in this case. That testimony conclusively demonstrates that the theory of the complaint fails to account for, and in fact contradicts, the approach of the FDCA and FDA.

When it promulgated its final rule about structure/function claims, the FDA explained by way of example that "to substantiate the claim 'supports mood,' it is not necessary to study the effects of a substance on clinical depression." 65 Fed. Reg. at 1012. In an additional example, the FDA stated that "[a] statement of support for the immune system, by itself, conveys no specific reference to disease treatment or prevention." *Id.* at 1029. Yet Dr. Miller testified that, by his reckoning, following either of these FDA examples would constitute false advertising. Blackburn Decl., Ex. 7, at 58:9-15 (Miller Tr.) ("Q. So -- so it's your testimony that a supplement that said 'supports mood' without a study demonstrating an effect on clinical depression, that would be a false statement? A. Yes"); *id.* at 59:5-14 ("Q. In your opinion, could a supplement claim to maintain healthy circulation without implying treatment or prevention of disease? A. I would say that would be a false claim ….").[6]

---

[6] Dr. Miller's views conflict with the FDA's on other points, as well. For example, he testified that "maintaining cholesterol levels is not essential to the structure function of the body for reasons other than prevention of disease," Blackburn Decl., Ex. 7, at 58:16-59:4 (Miller Tr.), while the FDA has specifically rejected this position, stating that, in fact, "maintaining cholesterol levels within the normal range is essential to the structure and function of the body for reasons other than prevention of heart disease," 65 Fed. Reg. at 1018. This is further evidence that Dr. Miller's epidemiological perspective differs from that of federal regulators who inform how nutritional supplement labels should be written and supported.

1    Dr. Miller's opinion, on which the case depends, and which is confessedly unburdened by

2  any knowledge or understanding of the FDA's structure/function-disease claim distinction,

3  comes down to his view that "without evidence of an impact on disease or death … a label

4  cannot say the product promotes heart health or circulatory health," *id.* at 101:23-102:10, and

5  that "to make that claim ["promotes immune health"] it [taking the vitamin E supplement] would

6  be like taking a medication that reduces infection," *id.* at 103:8-15. This is precisely the

7  argument that the First Circuit held could not stand in light of contradictory federal law.

8    The notion that an impact on disease is necessary to substantiate a structure/function

9  claim, if enforced under California state-law, would undermine both Congressional and

10  regulatory intent where Congress and the FDA have drawn a distinction between

11  structure/function and disease claims. To interpret the NLEA's express preemption provision to

12  allow a state-law claim to impose such a non-identical and even contradictory requirement on

13  nutritional supplement manufacturers would render a nullity the FDCA's construct of a

14  structure/function claim distinct from disease claims. *See Feder v. Frank (In re HP Inkjet Printer*

15  *Litig.)*, 716 F.3d 1173, 1184 (9th Cir. 2013) ("Under accepted canons of statutory interpretation,

16  we must … mak[e] every effort not to interpret a provision in a manner that renders other

17  provisions of the same statute inconsistent, meaningless or superfluous.") (quoting *Boise*

18  *Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991)).

19    It is further relevant to preemption that the Label in this case undisputedly includes the

20  congressionally drafted disclaimer that: "This statement has not been evaluated by the Food and

21  Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any

22  disease." Blackburn Decl., Ex. 6 (Label); *see also* 21 U.S.C. § 343(r)(6) (allowing

23  structure/function claims that include this disclaimer language). Dr. Miller testified that this

24  disclaimer is simply ineffective, Blackburn Decl., Ex. 7, at 135:3-18 (Miller Tr.); it is not,

25  however, his place to say so. To the contrary, his premise that the disclaimer is insufficient under

26  California law only further demonstrates how and why the claims in this case are expressly

27  preempted, because they would impose requirements not identical to federal law.

28    There is simply no way to square this case – depending as it does on Dr. Miller – with the

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   FDA's rules for making and supporting structure/function claims. This is illustrated by *Bradach*

2   where Dr. Miller testified. In that case, class certification was denied after the plaintiff testified

3   that he understood the label statement "helps maintain a healthy heart" to mean "preventing heart

4   disease." Blackburn Decl., Ex. 8, at 3-4 (*Bradach v. Pharmavite LLC*, Case No. 2:14-cv-03218-

5   GHK-AGR). The court ruled that such claims are preempted and that the only case that could, as

6   a matter of law, proceed would be one where the alleged falsity was not based on failure to

7   prevent disease, but instead was based on "structure/function reasons – *i.e.*, that the statement is

8   false because the supplements do not help the structure or function of the heart." *Id.* While

9   Dachauer testified that he did not understand the Label to suggest any impact on disease, the

10   only evidence proffered to support alleged falsity of the Label claim in this case is Dr. Miller's

11   testimony about whether supplementation impacts disease or death, as was the case in *Bradach.*[7]

12    The NLEA and FDCA's express preemption of any state-law based requirement for

13   labeling not identical to federal rules is broad and based on Congress's intent to place

14   exclusively with the FDA decisions about "the circumstances under which claims may be made

15   about nutrients in foods." *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 619-24 (4th Cir.

16   2015), quoting H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337

17   (affirming dismissal of label and advertising claims based on state-law requirements not identical

18   to federal rules and noting that Congress struck a balance in favor of uniform federal standards

19   notwithstanding the possibility of more stringent state-law rules, whether statutory or judicially

20   based); *see also Yumul v. Smart Balance, Inc.*, No. CV 10-00927 MMM (AJWx), 2011 U.S.

21   Dist. LEXIS 109952, at *29-32 (C.D. Cal. Mar. 14, 2011) ("courts in this circuit have repeatedly

22   dismissed claims under California's consumer protection laws that challenge labels such as these

23   as false and misleading on preemption grounds," collecting cases, and stating further that if the

24   defendant "complied with the regulatory requirements for labeling a product [in the manner

25

---

26   [7] Dr. Miller's report in this case was a cut-and-paste of his *Bradach* report, even including the label statement from that case ("maintains a healthy heart") in quotation marks as if it were also the statement in this case, which it is not. Blackburn Decl., Ex. 7, at 99:15-100:6 (Miller Tr.)

27   (testifying that he had "heard" that the Label in this case made the "maintains a healthy heart" claim).

28

1  challenged], then its label is not 'false and misleading.'"). In this case, NBTY followed the

2  FDA's rules for making structure/function claims on its vitamin E labels. Under the guise of

3  California's state laws, the complaint would nonetheless impose liability on NBTY based on the

4  theory that that structure/function are false absent evidence that the supplements further treat,

5  prevent or cure disease or else forestall all-cause mortality. Such a requirement contradicts the

6  requirements of the FDCA and its implementing regulations, which distinguish between

7  structure/function claims and disease (or even qualified health) claims for which the federal rules

8  would require proof of impact on disease. Preemption thus provides an additional, alternative

9  basis on which to grant summary judgment in this case.

10  **CONCLUSION**

11  In different combinations, but each time based on the same studies of vitamin E

12  supplementation as a potential treatment for disease or death, Plaintiffs' counsel in this case have

13  brought case after case challenging the structure/function claims on vitamin E supplement labels.

14  This includes this case, *Kaufman*, the *Bradach* and *Bohn* cases in which Dr. Miller has testified,

15  and *Trujillo v. Walgreen Co.*, No. 13 CV 1852, 2013 U.S. Dist. LEXIS 112404, at *1 (N.D. Ill.

16  Aug. 9, 2013) (complaint dismissed as preempted). None of these cases have prevailed for the

17  simple reason that the structure/function claims made on different vitamin E labels to the effect

18  that vitamin E promotes or supports heart, circulatory and immune health are substantiated and

19  true. Moreover, and critically, these claims are not rebutted by evidence that the supplements do

20  not treat, cure or prevent disease – which labels in each case expressly disclaimed.

21  Here, Dachauer testified frankly that he did not understand the label to suggest more than

22  an impact on structure and function. There is ample evidence that the supplements have precisely

23  such an impact, whether or not that impact is sufficient to also impact incidences of disease or

24  death. No evidence disproves this. Even Dr. Miller agreed. Neither is this state-law action a

25  proper forum to challenge the FDCA distinction between structure/function and disease claims or

26  to litigate the adequacy of the substantiation for the Label claims absent evidence of impact on

27  disease. For all of these reasons, as further explained above, summary judgment is properly

28  granted in this case against Dachauer and in favor of NBTY.

1

2

3   Dated:  December 22, 2016

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

A&G LAW LLC

By:    /s/ Robert M. Andalman
Robert M. Andalman
Attorneys for Defendants
NBTY, INC. and NATURE'S BOUNTY, INC.

1

## CERTIFICATE OF SERVICE

2

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

3

the CM/ECF system which will send notification of such filing to the Electronic Service List for

4

this Case.

5

                              Respectfully submitted,

6

Dated:  December 22, 2016        A&G LAW LLC

7

                         By:    /s/ Robert M. Andalman

8

                             Robert M. Andalman
                             Attorneys for Defendants

9

                             NBTY, INC. and NATURE'S BOUNTY, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28